Filed 5/23/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| LINDA M. HEYEN, | B237418 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC277481) |
| v. | |
| SAFEWAY INC. et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anthony J. Mohr, Judge. Affirmed.

Littler Mendelson, J. Kevin Lilly, R. Brian Dixon, and Philip L. Ross for Defendants and Appellants.

Law Offices of Stephen Glick, Stephen Glick; Law Offices of Ian Herzog, Ian Hergoz; Daniels, Fine, Israel, Schonbuch & Lebovits, Paul R. Fine, Scott A. Brooks, and Craig S. Momita for Plaintiff and Respondent.

Plaintiff/respondent Linda Heyen is a former assistant manager for defendant/appellant Safeway Inc. (Safeway). After Safeway terminated her employment, Heyen brought this action to recover unpaid overtime pay, contending Safeway should have classified her as a "nonexempt" employee because she regularly spent more than 50 percent of her work hours doing "nonexempt" tasks such as bagging groceries and stocking shelves. An advisory jury and the trial court agreed with Heyen and awarded her overtime pay of $26,184.60, plus interest.

Safeway appeals, contending that the trial court failed to properly account for hours Heyen spent *simultaneously* performing exempt and nonexempt tasks—i.e., "actively . . . manag[ing] the store while also concurrently performing some checking and bagging of customer grocery purchases." Safeway urges that, consistent with federal law, the trial court should have classified as "exempt" *all* hours during which Heyen simultaneously performed exempt and nonexempt tasks. Because the court failed to do so, Safeway claims it prejudicially erred, requiring a reversal of the judgment.

We disagree with Safeway's analysis as inconsistent with California law. Hence, we affirm the judgment for Heyen.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Peter Knoch and Jason Ritchey filed the present action on July 31, 2002, against Safeway and The Vons Companies, Inc. (Vons) alleging causes of action for nonpayment of overtime compensation and unfair business practices. They filed a second amended complaint adding Heyen as an additional plaintiff on December 20, 2006.

On September 11, 2008, the trial court denied plaintiffs' motion for class certification. Thereafter, Heyen's claims were tried before an advisory jury over 10 days in June and July 2009. The relevant testimony is summarized below.

2

## A. *Plaintiff's Case*

### 1. William Gillette

Gillette was a Safeway assistant manager in 2004 and 2005. He testified that "operating ratio" or "O.R." refers to the number of labor hours budgeted to a Safeway store based on the store's sales. O.R. is calculated on a weekly basis. A manager is disciplined for missing O.R. in any week.

Gillette opined that Safeway's expectations for O.R. are not realistic. Under the company's "checkout success" policy, if three customers are in a checkout line, a new line must be opened. Gillette said there are not enough hourly employees to keep the checkout lines as short as company policy requires, and thus "you basically have to take the salaried employees and have them do hourly work in order to hit both the checkout piece of it and still make your payroll budget."

When Gillette was an assistant manager, he typically worked between 60 and 70 percent of his time as an hourly employee. He had superiors tell him that he would have to be in the checkout line for more than 50 percent of his time in order to make budget. Superiors also told him that "it's up to you as an assistant manager to make O.R. in any way you can, but you better make it." He believed Safeway's "superior service" and "checkout success" programs require salaried employees to do hourly work. "[I]t's a requirement that we hit our payroll budget and a requirement that we hit our checkout success, and in order to do that, given the constraints of what they give us to do our labor, we have to be in the check stand 65 to 70 hours of our time. . . . It could be putting bananas on the shelf because the produce manager is on the check stand, or it could be filling the beer box because . . . the beer box didn't get filled that day or somebody bought a bunch of beer, and we want to make sure that we get the stuff back on the shelf for the evening crowd."

Gillette said managers had very little discretion in operating their stores. They did not have discretion to price merchandise, put merchandise on sale, choose what to stock, create store promotions, determine when to take store inventory, select store staffing levels, select the number of labor hours budgeted to the store, set store hours, hire

3

assistant managers, set employee pay rates, determine employee dress codes, determine store layout, select the store suppliers or vendors, or set the criteria for employee evaluations.

Gillette testified bookkeeping had been a high-paying job before the supermarket strike, but afterwards became a low-paying, hourly position. Safeway budgeted five hours per day for bookkeeping, and it trained the assistant managers to do the books if the bookkeepers could not.

Gillette agreed that as a manager, he observed his employees constantly, albeit "[m]ostly from the check stand." When he worked a check stand, he also ran the "front end" of his store, observing whether the checkers on adjacent stands were doing their jobs correctly. Gillette said he was always doing several things at the same time, and that multitasking was "part of the job."

### 2. Linda Heyen

Heyen was transferred to the Oceanside store after the supermarket strike ended in April 2004, and she worked there until October 2005. When she transferred to Oceanside, Allen Martin was the store's manager. The store was at that time having trouble retaining a bookkeeper and "courtesy clerks," who "[b]ag[] groceries, bring[] in the carts, do[] customer service as far as taking a customer to the item." As a result, Martin asked Heyen to do the store's bookkeeping.

About a month and a half after Heyen transferred to Oceanside, Martin was replaced by manager Daniel Lombardo. The store was not given enough hours to make O.R. without both Heyen and Lombardo doing the work of hourly employees, such as checking and general merchandising. Heyen typically spent four to six hours per day bookkeeping, and about three hours in the front end of the store. On delivery days, she typically spent six to eight hours merchandising, working 14 to 15 hours per day.

During Heyen's tenure in Oceanside, Lombardo became ill and Heyen took over his responsibilities. During that time, she worked about 15 hours per day, doing hourly tasks for about 12 to 13 hours. On about six occasions, she worked six days a week.

4

Because she was not getting enough sleep, she temporarily relocated to live closer to work. She told her district manager that she needed some help, but he said he could not help her because "it is all sent down by industrial engineering." Eventually, the long hours began to affect Heyen's health and she asked to be reassigned to a store closer to her home.

As the assistant manager in the Oceanside store, Heyen was responsible for the sales forecasts and the master budget. She also was responsible for all store operations, including supervising the store's 25 to 35 employees. She hired and trained staff, maintained employee files, disciplined employees, did salary performance paperwork, responded to management email, prepared reports, scheduled employees, and did employee evaluations. She was responsible for safety, cash security, and assuring that employees did not over-order supplies.

According to Heyen, "We cannot run the store with what they give us without the manager and assistant manager working hourly like the other hourly employees. It's impossible." Moreover, she said, the demands of the job required that the manager and assistant manager work "[m]uch more" than 40 hours a week—"[t]hat's the only way we can get it done."

Heyen said that before the strike, Safeway hired experienced bookkeepers who were paid $17.90 per hour and were permitted six to eight hours each day to do the books. After the strike, Safeway hired untrained bookkeepers who were paid $7 per hour and were permitted only three hours per day to do the books. As a result, "an assistant manager like myself had to make up what they couldn't get done — what they couldn't finish with all the mistakes that they made."

As a salaried employee, Heyen earned $50,200 per year, calculated as $25.72 per hour for 40 hours per week. Based on the number of hours she actually worked, Heyen said she actually made less per hour than she had made as an hourly employee.

Heyen agreed that she was able to manage the store and work the register at the same time. When she was stocking shelves, she was also observing general conditions in the store.

### 3. James Reynolds

Reynolds was promoted to Safeway assistant manager in 2002. He expected that he would be given management duties, but actually spent most of his time stocking and checking because the store had not been allotted sufficient employee hours. At one point, his district manager told Reynolds that he would have to work six days per week because the store's "checkout success" and "superior service" were not adequate. Reynolds was working an average of 12 hours per day at that time.

### 4. Luis Valle

Valle worked for Safeway for 25 years, from 1981 until June 2005. He began as a courtesy clerk, was an assistant manager from 1995 until 2004, and then was a corporate auditor from 2004 to 2005. As an auditor, Valle did about 170 different audits. He consistently heard from managers that they were not allocated enough hours to get all the work done properly. He explained: "Every department and everybody in the store has a function. Every department gets some hours, but all of the departments basically don't get enough hours, you know. There's just never enough hours for what they need to do, and the expectations are so high that they just don't have the hours. The O.R. that they get, the manpower that they get to do the business for the week is — it's just not there. So as I would come into the store, managers are trying to fill the gap wherever there's a need. They need to go and do a clerk's job, an hourly clerk job. Because the assistant managers and the store managers, they don't clock — punch in the clock, so for them there's no need for breaks, no need for lunch. They sacrifice all of that, and they [work] hours and hours and those extra days that they're not even supposed to be there because they just don't have enough hours, and they got to meet the payroll needs; they got to meet the O.R."

Valle said that before the supermarket strike, highly-paid bookkeepers spent six to eight hours per day keeping the books. After the strike, Safeway was allowed under the new collective bargaining agreement to use lower-paid, inexperienced clerks to do the

6

bookkeeping. The new bookkeepers worked on the books only two hours per day and "never had the benefit of the training, and that's why there were so many mistakes."

Valle said that the assistant managers were required to be in the front of the stores at least eight hours per day, "[b]agging, checking, making sure that everything is flowing through the register, . . . greeting the customers."

5.     Daniel Lombardo

Lombardo worked for Safeway for 38 years. He was a store manager for about 20 years, until he retired in 2007. In May 2004, Lombardo was assigned to the Oceanside store, where Heyen was the assistant manager. In Oceanside, Lombardo spent about 75 percent of his time doing hourly work such as checking, receiving, collecting carts, and stocking. He typically worked 10-12 hours per day. Heyen also worked more time than she was scheduled. The long hours were necessary because Lombardo did not have enough help in the store. In his experience, there was no way all of the necessary work could be completed without the manager and assistant manager doing a significant amount of hourly work. The Oceanside store was somewhat unusual in this regard because it was a very low volume store and so there was not much hourly help in the store. Even during the busiest times of day, there were only seven or eight employees in the store.

Lombardo said there were chronic bookkeeping problems in the Oceanside store and Heyen had to fix the bookkeeping errors. He estimated that she, too, spent about 75 percent of her time doing hourly work. At one point Lombardo became aware that Heyen was working six and seven days a week because the store did not have a bookkeeper. Lombardo called his district manager for help and was told something like, "Do what you can."

Lombardo took medical leave from the Oceanside store for three weeks when he had knee surgery, and another four days when he had chest pains. During those times, Heyen took on the responsibilities of store manager.

7

The store was allowed an additional 40 hours of employee time during Lombardo's absences, but that wasn't sufficient because Lombardo did more than 40 hours worth of work in a typical week.

While working a check stand, Lombardo was "kind of managing a store," but "it's not a very effective way to run a store." He conceded that while in a check stand, he was able to direct other employees, answer questions, observe the check lines, and observe store conditions. However, he was not able to coach other employees because "[m]y focus was on the customer."

Lombardo agreed that the store's managerial functions included planning and budgeting, which he and Heyen typically did together. Heyen did the schedule and generally was in charge of the store's front end. She also hired employees as necessary. Lombardo agreed that Heyen would decide when to go home at the end of the day. Lombardo believed Heyen was a very hard worker who met his expectations as an assistant manager.

### B. Safeway's Case

#### 1. Krista Rush

Rush testified that she currently was an hourly manager for Vons. Immediately after the supermarket strike, she worked as a bookkeeper in the Oceanside store. She had never done books before, but she was able to learn to do them in about two weeks. It generally took her about three and a half hours per day to do the books. She had no trouble getting the work done during her scheduled hours. At some point, Rush trained other people to do the books. Heyen was generally in her managerial office "[a] little more than half" the day.

#### 2. Victoria Settles

Heyen hired Settles to work as a bookkeeper in the Oceanside store in August 2005. Heyen trained Settles to do the bookkeeping. It generally took Settles three to four hours a day to do the books, and Heyen never had to finish Settles's work. Settles said

she subsequently kept the books at four other Safeway stores; the bookkeeping at the Oceanside store was the easiest.

Before Settles was hired to work at Safeway, she shopped frequently at the Oceanside store but she never saw Heyen. She met Heyen for the first time when she interviewed for the bookkeeping job. Once Settles began working at the Oceanside store, she frequently saw Heyen doing paperwork at her desk. She did not recall ever seeing Heyen work anywhere other than at her desk. Settles occasionally saw Heyen on the floor, but she "wasn't doing anything."

Settles sometimes "faced" the health and beauty aisle,[1] which typically took her less than an hour. She did not recall whether she ever saw Heyen "facing" the health and beauty aisle.

Settles said that the Oceanside employees were frustrated with Heyen's scheduling: "[T]hey used to say how she couldn't schedule anybody with their right job, and that they were all getting frustrated because they didn't have the right amount of hours for the jobs or knowing when that — the product would come in to be scheduled for it and how to do it. So there's a lot of conflict there with the orders and everything." Further, Settles said employees "walked on pins and needles around [her]. . . . She . . . had a very strong personality. You know, so it's like, 'You better do this' — or, you know, that's how you felt, or else you were gone, too, or getting watched by whoever she tried to get to watch you."

### 3. Tariq Salihi

Salihi began working for Safeway in the Oceanside store in February 2005. He said Heyen generally arrived at work between 6:30 and 7:00 a.m. He never saw Heyen "walk the store"; generally, he found her in her office. He estimated that Heyen spent about 85 percent of her time in her office, generally working on the schedule. He saw Heyen working in the check stands only a few times each week.

---

[1] Another employee described "facing" as the process of "pulling the items forward so [they were] all flush with the front of the shelf."

Salihi said there were significant problems with the schedule that made his job stressful. He said: "[I]f somebody is not scheduled to work and you have a load sitting there, basically it fell on me or somebody else and made my job harder or somebody else — if I was scheduled off and there's a milk load that is coming in and nobody is working dairy. So it's really important to make sure you have the right people at the right time."

Salihi said he never saw Heyen break down a load, work in the frozen food area, sweep floors, bring carts from the parking lot, or carry groceries to customers' cars. He recalled seeing Lombardo checking groceries, but said that because the store was small, "[y]ou basically had two cashiers that could run the whole store the whole day." If assistance was needed, "it's usually the produce guy comes and checks or the dairy person . . . . So [for] a manager having to check that's — that means it must have been like a holiday or something. We don't never make that kind of business."

### 4. Gregory Boswell

Boswell worked in the Oceanside store before and after the supermarket strike. He worked with Heyen approximately four days a week the whole time she worked in Oceanside. He said she generally left work at about 6:00 p.m. The latest he ever saw her leave was 7:00 p.m. Most often, when Boswell arrived in the store, Heyen would be "up front running the front end or the check stand or in the back."

According to Boswell, there were frequent problems with Heyen's schedules: "[S]hortly after she assumed the schedule-writing function, there would be lapses in the schedule; i.e., I wouldn't have a closing courtesy clerk, or possibly even a checker . . . ."

Boswell believed Heyen spent no more than two hours per week "facing" aisles. She disciplined employees as necessary. He knew she did some bookkeeping, but he did not know how much time she spent doing it. He said Heyen routinely worked more than 40 hours per week—"It's kind of common knowledge in the grocery business that they are expected to work five 10-hour days, 50-hour workweeks."

10

### 5. Ronald Alguire

Alguire was the director of industrial engineering for the Vons division of Safeway. He worked for Safeway for 35 years, and was a store manager for 20 years.

Alguire testified that the company conducted time studies to acquire the data that formed the starting point for O.R. The company determined how long it took to perform various tasks, and then those time values were translated into labor budgets for particular stores.

### 6. Christopher Ratto

Ratto was a program manager with the leadership planning and development group. He testified that managers were expected to "pitch[] in when needed to get a job done." So, "if it turned out that the parking lot needed to be swept, that might be something that if the manager had a free moment [he or she] should pitch in and do." In such a case, the manager would be "acting as a team coach." He said, however, that a manager could not manage a store properly if he or she was spending more than half of his or her time doing hourly tasks because "part of managing and being able to provide service to the customers is to be able to coach, provide guidance to the clerks. . . . [F]or example, in the check stand, if I've got a checker who their productivity — maybe they are slow[ing] down for some reason, I as a manager can help that checker out, make some adjustments to be able to get productivity up. So if I'm in the check stand more than 50 percent of the time, I'm not able to effectively provide that coaching to the employees."

### 7. Allen Martin

In March 2004, Martin was the manager of the Oceanside store where Heyen was the assistant manager. Martin and Heyen worked together for about eight to 10 weeks, usually three days per week.

When Martin and Heyen worked together, she was responsible for the "front end" employees. In that capacity, she coached the employees and sometimes rung up sales.

11

Martin estimated that Heyen worked at a check stand for one to two hours per day. When Martin was not in the store, he expected Heyen to act as store manager. Martin typically worked about nine and a half hours per day, five days per week. Even when Martin was not in the store, he had information about Heyen's activities through employee input and store conditions. Based on those sources of information, he concluded the store was not being managed as it should have been on his days off. He told Heyen he was getting employee input that she was spending too much time in the office and was not available for employee and customer needs. She agreed that she could probably spend less time in the office.

Martin estimated that he spent three to eight hours per week checking groceries. He did not stop managing the store when he was in the check stand. He always checked in one particular check stand because there he did not have his back to any of the employees or customers, and he coached employees on such things as cleanup, bagging, and refunds.

As manager, Martin spent a half hour to an hour each day preparing sales tracking reports. To make sure he met his budget each week, he built in a "cushion" by under-forecasting sales, understating hours, and overstating the expected wage rate. He would then make adjustments on a daily basis, and he taught Heyen to do the same. He also taught Heyen to do scheduling.

Martin recalled missing O.R. three times while at the Oceanside store. Each time, he received a phone call from his district manager and some coaching, but no one ever threatened to fire him. Martin considered meeting O.R. to be one of his job duties, and he never had difficulty meeting O.R. at the Oceanside store.

As manager, Martin checked time and attendance records (15 to 45 minutes per day), reviewed reports that the store received from corporate, held "service huddles" (gathering employees to discuss a particular area of service), managed the store's front end, performed "store walks" (in which Martin walked "every square inch of the store" to observe store conditions and speak to employees, a task which took one to three hours daily), hired new employees, coached, counseled, and disciplined employees, and

12

ensured compliance with laws and regulations. As assistant manager, Heyen did those tasks as well. When he worked in the Oceanside store, Martin spent between five and 10 percent of his time doing things like "checking out customers at the check stand, bringing carts in, bagging groceries, stocking shelves, . . . that type of work." He never spent anything close to 50 percent of his time doing hourly tasks, and he was able to meet his O.R. requirements nevertheless.

On cross examination, Martin agreed that he spent three to five hours per day managing the front end of the store, including checking and bagging groceries, getting carts from the parking lot, doing money orders, and getting cigarettes. Before he left the store, typically at 5:30 p.m., he would do "out-of-stocks," which was work that an hourly person could do as well. He did not typically take a break for lunch.

Martin believed that Heyen worked hard to learn the job. She did bookkeeping after the strike, even though bookkeeping was usually done by an hourly employee. When they worked together, Heyen spent minimal time disciplining employees, typically less than an hour a week. Martin typically did the scheduling with Heyen's assistance. Heyen did little hiring. There were virtually no restrictions on the kind of work he or Heyen could do.

### C.    Jury Instructions

At the conclusion of the testimony, the court instructed the jury that it must determine whether, as a Safeway assistant manager, Heyen was "primarily engaged" in exempt or non-exempt work:

"In determining whether Ms. Heyen is 'primarily engaged' in exempt work or non-exempt work, you should consider, first and foremost, how the employee actually spends his or her time. But you should also consider whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job."

13

"The test to determine whether defendants have met their burden to show that plaintiff spent more than 50% of her time engaged in exempt tasks is quantitative. The test requires that, first and foremost, you must look to the actual tasks performed by plaintiff. Merely because an employee has the duty of managing is not sufficient to establish exempt status."

"If a party claims that an employee is engaged in concurrent performance of an exempt and non-exempt work, you must consider that time to be either an exempt or a non-exempt activity depending on the primary purpose for which the employee undertook the activity at that time. The nature of the activity can change from time to time."

"In this case, you will be called upon to decide whether, while working for Defendants, Plaintiff performed exempt tasks for more than 50% of her time. In making this determination, you should consider the following tasks to be exempt or non-exempt, as indicated. This list is a guide; it is not all-inclusive.

"Exempt tasks include: [¶] 1. Forecasting of store sales. [¶] 2. Scheduling the work of store employees. [¶] 3. Monitoring store sales and adjusting schedules to ensure compliance with payroll budgeting ('OR'). [¶] 4. Directing the work of store employees. . . . [¶] 5. Inspecting store conditions. [¶] 6. Inspecting and reviewing the work of store employees. [¶] 7. Activities, such as . . . audits and pulls, authorizing overrides, and providing for the safety of the employees and property. [¶] 8. Training employees. [¶] 9. Coaching store employees. [¶] 10. Counseling, disciplining and firing store employees. [¶] 11. Interviewing and hiring employees, including time spent instructing and supervising others in the process of selecting job candidates. [¶] 12. Preparation and review of management paperwork such as: 259 reports, and profit and loss reports. [¶] 13. Review and sort e-mail and conventional mail and determine follow up action needed. [¶] 14. Review of store employees' time and attendance records, including identification and completion of paperwork for edits needed to ensure accuracy of such records. [¶] 15. Monitoring store conditions and delegating tasks to employees to meet federal, state and local laws and regulations regarding licensing, food

14

safety, worker and customer safety, and consumer protection law (for example, food recall, weights and measures requirements).  [¶]  16.  Handling employee complaints and grievances.

"Non-Exempt Tasks include:  [¶]  1.  Ringing up sales for customers.  [¶] 2.  Cashiering.  [¶]  3.  Bagging groceries and/or assistance to customers with carry out. [¶]  4.  Assisting customers with routine matters (for example, finding an item in the store).  [¶]  5.  Stocking or facing merchandise, including items in the general merchandise, health and beauty aids aisle(s).  [¶]  6.  Bookkeeping.  [¶]  7.  Mopping and sweeping floors.  [¶]  8.  Retrieving shopping carts from parking lot.  [¶]  9.  Constructing merchandise displays.  [¶]  10.  Selling money orders and lottery tickets.  [¶] 11.  Stocking and replenishing stock on shelves, including out-of-stocks.  [¶] 12.  Fetching items for customers.  [¶]  13.  Unloading trucks and unpacking merchandise.  [¶]  14.  Stocking beverage and other coolers.  [¶]  15.  Labeling shelves, completing signage including shelf and price tags.  [¶]  16.  Driving motorized pallet movers.  [¶]  17.  Gathering shopping carts.  [¶]  18.  Cleaning.  [¶]  19.  Maintaining the back room.  [¶]  20.  Putting up and taking down product displays and decorations.  [¶] 21.  Preparing payroll."

"In making your decision, you may consider whether the manager is doing work of the same nature as work routinely done by hourly paid employees."

### D.    *Special Verdict*

On July 13, 2009, the jury returned an advisory special verdict as follows:

"Did Safeway Inc. and The Vons Companies, Inc. prove that Linda Heyen spent more than 50% of her time each and every week from March 29, 2004 to October 30, 2005, performing exempt tasks as defined by the Court's Instructions?"

"Answer:  . . . No."

"Did Safeway Inc. and The Vons Companies, Inc. prove that Linda Heyen was primarily engaged in exempt work in each and every week from March 20, 2004 to October 30, 2005?"

15

"Answer: . . . No."

"Did plaintiff Linda Heyen prove by a preponderance of the evidence that she worked overtime hours during any week in which Safeway failed to prove that she was an exempt employee?

"Answer: Yes."

"For those weeks for which you find Safeway Inc. and The Vons Companies, Inc. failed to carry their burden, how many days and how many hours do you find that Linda Heyen worked?

"Answer: 108 Days and 14 Hours per day."

### E. Statement of Decision

On September 26, 2011, the trial court issued a statement of decision that stated as follows:

"Plaintiff Linda Heyen's case proceeded to trial before an advisory jury. On July 13, 2009, following the presentation of evidence and arguments of counsel, the jury unanimously determined the following facts:

"a) Safeway did not prove that the plaintiff spent more than half her time each week from March 29, 2004 to October 30, 2005 (the work period), performing exempt tasks as defined by the jury instructions.

"b) Safeway did not prove that the plaintiff was primarily engaged in exempt work during the work period.

"c) Plaintiff proved that she worked overtime hours during any week in which Safeway failed to prove she was an exempt employee.

"d) For those weeks during which Safeway failed to carry their burden, Linda Heyen worked one hundred eight days and fourteen hours per day.

"The court has given considerable thought to the evidence and has concluded that the jury's advisory verdict is correct. The evidence supports their findings.

"The court has reviewed the testimony of the witnesses called by the defense. Their testimony is forthright, but even if they are believed, they do not shift the burden of

16

proof to the plaintiff with respect to the number of non-exempt hours she worked and the tasks she performed. The court has also considered evidence developed during the defense cross-examination of the plaintiff's witnesses. Again, that evidence does not shift the burden of proof to the plaintiff in this regard. Meanwhile, Linda Heyen presented herself as a credible witness, and the court accepts what she [said]. For example, several defense witnesses said that they always saw Ms. Heyen in her office, not on the floor. Linda Heyen denied that, and the court is hard-pressed to disbelieve her. In addition, she testified more than once that she worked fourteen to fifteen hours a day. The jury chose the lower number of fourteen hours for its verdict, and there is substantial evidence to support their finding.

"Meanwhile, several of the plaintiff's witnesses, as well as the plaintiff herself, were equally credible and succeeded in meeting plaintiff's burden to prove the overtime hours she worked as well as shifting back to Safeway any burden of proof that Safeway managed to shift to Ms. Heyen. A few examples are illustrative.

"William Gillette's testimony supports the plaintiff. The court recognizes that plaintiff's counsel represents him in a claim against Safeway and that he hopes 'like heck' that plaintiff wins. That aside, he impressed the court as a credible individual and the court believes that he worked considerable overtime hours. He has been in the Safeway system long enough (some 27 years) to know the policies and the culture and, in particular, STAR, the operating ratio (OR) program and how labor is budgeted. He said—and based on extensive testimony about [this] from him and other witnesses, the court believes him—that the expectations for meeting OR were not realistic. There are not enough hourly employees to handle the expectations and still 'make the budget.' Notwithstanding this, one could be disciplined, even terminated, for missing '100% OR.' As a result, to avoid 'busting OR,' the assistant manager ('AM') had to perform hourly, non-exempt, work. He testified that during his time as AM, he spent 60% to 70% of his time as an hourly employee, doing jobs like putting bananas on shelves, filling the beer box, checking out customers, and bagging. No one criticized him for performing these

17

tasks; indeed, he was not criticized for spending up to 70% of his time performing hourly work.

"Adding to the problem is Safeway's 'check-out success goal' of getting people out of the store as quickly as possible. If three people are in line, the staff is supposed to open up a new queue. If not enough food clerks are available, salaried management must jump in and help out customers. Gillette's superiors told him he had to be at the check stand over half the time to meet the budget. He obeyed them.

"Mr. Gillette said that even as a manager, he had minimal discretion. 'They handcuff us' with numbers they have to hit, he said. 'It's "here's your numbers; hit them or else,"' and those numbers come down from an industrial engineering division of the company. He felt what he was doing constituted part of his management duties. Safeway told him he was running the store, gave him the hours he had to accomplish, and said that if he could not succeed within those parameters, they would find someone who would. He testified that he had no discretion to price merchandise, put merchandise on sale, decide what to stock, create store promotions, determine when to take inventory, select staffing levels, choose the amount of labor hours to budget to his store (OR), set store hours, hire assistant managers, set pay rates for employees, determine dress codes, select the layout or design of a store, select vendors, select the criteria for employee evaluations, choose where to put items on shelves, set up displays, determine what goes on end caps (i.e., large displays on the end of aisles), or determine what to give out as free samples. On one occasion, he brought in extra cases of vodka because he thought he could sell more of it just before the Super Bowl. However, someone 'from corporate' demanded to know who authorized that decision.

"Gillette also testified that although bookkeeping is important and used to be a high paying position, it now is an hourly position.

"Also supporting the plaintiff was Daniel Lombardo, who managed the Oceanside store during May, 2004, replacing [Allen] Martin. Linda Heyen was Lombardo's assistant manager. He confirmed the iron laws of the OR system and the dire consequences of 'missing OR.' That and the 'superior service' concept constituted the

most important aspects of the job, the former because it determines the budget, the latter because Safeway believed that 'superior service' raised sales. Lombardo spent some three-quarters of his time performing hourly work—clerical tasks like checking, receiving, collecting carts, stocking dairy, stocking the beer box, and dressing down produce (i.e., making the displays look more attractive). He usually worked ten or eleven hours a day, sometimes twelve. This amounted to much more time than he was scheduled to work. He also said that he engaged in checking probably five to six hours a day on average and—over a twenty day period—spent more than 120 hours checking. While he could 'manage while checking' by keeping an eye on the other employees, Lombardo said this was not the most efficient way to run the store. He would try to take lunch, but often could not because he would be called to check out customers, or a truck would come in early and he had to pull off the load.

"Lombardo confirmed that the plaintiff also spent more time checking than she had been scheduled. Like Ms. Heyen, Lombardo received little help at the Oceanside store. As others testified, he was expected to 'get the job done' and could not do so (and could not make OR) without devoting substantial portions of his time to non-exempt tasks. That is why both he and Linda Heyen worked extra hours. Moreover, there were occasions when he asked the plaintiff to come in to work early.

"Mr. Lombardo confirmed there were problems with bookkeepers at this store. Before the Safeway strike, most bookkeepers were journeyman clerks who had been handling books for years. That changed. People who were rather ignorant of bookkeeping procedures kept showing up at Oceanside, and to do their job, they required more than the two or three hours that had been allocated on the planning sheets. As Lombardo explained, if one scheduled hours greater than the allotted quota, it became necessary to take hours from another department or job function, in effect borrowing from Peter to pay Paul. Worse yet, they caught a bookkeeper stealing (apparently over $30,000), fired her, and then had trouble replacing her. The only stopgap measure Lombardo could employ was to use the plaintiff, because Lombardo did not know how to

19

keep the books. Lombardo said that while the district manager, Rick Winters, was aware of this problem, his only reaction was to say in essence, 'Too bad. Take care of it.'

"In addition, Lombardo was absent for some six to seven weeks because of vacation and medical issues. During those periods, Linda Heyen took over the responsibility of a store manager. She never left early; Lombardo praised Ms. Heyen for her hard work, work that exceeded his expectations.

"Although wordy and hard at times to understand, Luis Valle, who audited for Safeway, confirmed in a credible manner most of what Lombardo and Heyen said about AM's performing large amounts of non-exempt hourly work.

"Finally, there is Linda Heyen. From April 2004 to October 2005, she was the assistant manager at Safeway's Oceanside store. From the outset, she experienced retention problems with courtesy clerks (who bag groceries, bring in carts, take customers to items they are looking for, etc.). She also had problems with the bookkeepers, with the result that she performed most of the bookkeeping. [Allen] Martin, her manager, was in the store often while she kept the books and knew she was doing so, but he never objected. Ms. Heyen said that without her and Lombardo performing hourly work, she could not make OR for the Oceanside store. Therefore, she performed non-exempt activities, especially checking. She testified that it took her four to six hours daily to do the books and six to eight hours to take care of a load (i.e., break down packages when they came in on pallets and put them on shelves, in the back room, etc.). In all, she worked fourteen to fifteen hours a day, numbers she testified to at least twice. She also said that she was required to be on the floor at the front end from 3 PM to 7 PM. When she was out of her office and on the floor, Heyen was required to offer 'superior service,' i.e., greet customers with a smile, take them to items, and ask if they need any help. This was hourly, non-exempt work that everyone had to do, from the lowest to highest ranked employees at the store.

"While it is true that Ms. Heyen had the authority to hire a few staff members, whom she supervised, and that she had the discretion to organize some charity events, such as car washes, these facts do not overpower plaintiff's evidence of extensive non-

20

exempt work that was necessitated by the dictates to meet OR and maintain 'superior service' in a store that, while small, was understaffed. Ms. Heyen had to spend time manning the customer service booth, cashing checks, issuing money orders, and selling miscellaneous items like cigarettes and lottery tickets. What's more, as stated earlier, she had to perform bookkeeping tasks. Before the strike, experienced bookkeepers were allowed six to eight hours a day to keep Oceanside's books. Following the strike, untrained employees were allowed two to three hours for that job. That limit was not realistic. The bookkeepers plaintiff managed to hire were not trained or skilled, and—worse—they stole. As the assistant manager, it fell to Heyen to make up the shortfall and correct all their errors. Safeway realistically expected no less. The defense produced a witness who complained that Ms. Heyen spent a large amount of time bookkeeping in the office. Ms. Heyen readily admits that she did. She had to. It is true that [Safeway] tells managers not to micromanage the bookkeeping operations, for the company does not expect them to replicate the bookkeeper's job. But in plaintiff's case, she had no choice.

"During the years she was there, Linda Heyen was unable to run the store without salaried people performing hourly work. She testified credibly that one cannot manage the Oceanside store with the allocated budget unless the store manager and the assistant manager worked hourly tasks like the other hourly employees. She had no choice but to work more than forty hours a week. To do otherwise, she said, was 'impossible.' The court accepts the jury's determination.

"Christopher Ratto confirmed the importance of 'superior service,' to the point that this court concludes that the concept was paramount to Safeway's culture. The grocery industry is highly competitive, and one of Safeway's strong points of differentiation from competitors like Costco, Sam's Club, Wal-Mart and Kmart is the concept of superior customer service. As a strategy, 'superior service' constitutes a key to Safeway's long term future success. It is a win[-]win situation for all involved, and a manager's understanding and commitment to 'superior service' is crucial. The manager is obligated to support this program on a daily basis by acting as a role model, coaching employees on how to provide 'superior service,' and fostering a work environment that

21

nurtures a 'superior service' attitude, achieves a 'superior service store,' and ensures that only those persons who clearly possess the potential to provide 'superior service' are considered for employment. The attributes include greeting customers, anticipating their needs, taking customers to the items they want, and bagging their purchases with care. Ratto said that when they get busy, 'turn it up a notch.' Make eye contact; thank customers by name; learn their names; and—most significant for this case—pitch in when needed to get the job done. Managers were trained to do all of these things, and this constitutes another reason why the evidence preponderates that with respect to Linda Heyen's store, she had to engage in non-exempt functions most of the time. She did what she had been trained to do. . . ."

Based on the foregoing, the trial court awarded Heyen $26,184.60 in unpaid overtime wages, plus prejudgment interest. The court entered judgment for Heyen on September 26, 2011. Defendants timely appealed.

## DISCUSSION

Safeway contends the trial court made two errors of law that require reversal. First, the trial court failed to recognize that a managerial employee like Heyen can simultaneously do "exempt" and "nonexempt" work—i.e., manage a store while bagging groceries. The trial court therefore erroneously told the jury that it must categorize Heyen's various tasks as "exempt" or "nonexempt" (but not both), and it must characterize the work as "nonexempt" if Heyen's "primary purpose" in engaging in it was not supervisory. Second, the court failed to account for Safeway's "reasonable expectations" in determining the amount of exempt and nonexempt work Heyen performed—in other words, to consider whether Heyen performed nonexempt work because she chose to, not because Safeway expected her to. We consider these issues below.

22

**I.    THE EXECUTIVE EXEMPTION**

Under California law, employees are entitled to overtime pay for any work in excess of eight hours in one workday, or 40 hours in any one workweek, unless the employer affirmatively establishes that the employee qualifies for a statutory exemption. (*Conley v. Pacific Gas & Electric Co.* (2005) 131 Cal.App.4th 260, 266; Lab. Code, §§ 510, 515.)  One such exemption is set out in the Industrial Welfare Commission's (IWC) Wage Order 7, codified in the California Code of Regulations, title 8, section 11070 (Wage Order 7), entitled "Order Regulating Wages, Hours, and Working Conditions in the Mercantile Industry."[2]  Wage Order 7 defines an "executive exemption" from overtime pay as follows:

"The following requirements shall apply in determining whether an employee's duties meet the test to qualify for an exemption . . . :

"(1)  Executive Exemption[.]  A person employed in an executive capacity means any employee:

"(a)  Whose duties and responsibilities involve the management of the enterprise in which he/she is employed or of a customarily recognized department or subdivision thereof; and

"(b)  Who customarily and regularly directs the work of two or more other employees therein; and

"(c)  Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and

"(d)  Who customarily and regularly exercises discretion and independent judgment; and

---

[2]    The IWC is the state agency empowered to formulate regulations (known as wage orders) governing minimum wages, maximum hours, and overtime pay in California. The IWC has promulgated 15 wage orders, applying to separate industries, which each follow a similar format.  (*Bell v. Farmers Ins. Exchange* (2001) 87 Cal.App.4th 805, 809 (*Bell*).)

23

"(e) *Who is primarily engaged in duties which meet the test of the exemption. . . .*

"(f)  Such an employee must also earn a monthly salary equivalent to no less than two (2) times the state minimum wage for full-time employment.  Full-time employment is defined in Labor Code Section 515(c) as 40 hours per week."  (Italics added.)

Wage Order 7 is a "quasi-legislative regulation subject to normal principles of statutory interpretation."  (*Bell*, *supra*, 87 Cal.App.4th at p. 810.)  Statutory provisions regulating wages that are enacted to protect employees are liberally construed with "'an eye to promoting such protection.'"  (*Ramirez v. Yosemite Water Co*. (1999) 20 Cal.4th 785, 794 (*Ramirez*).)  Exemptions are narrowly construed and, as affirmative defenses, must be proved by the employer.  (*Id*. at pp. 794-795.)  Further, because the elements of the exemption are stated in the conjunctive, all criteria must be established for the exemption to apply.  (*Bell*, *supra*, 87 Cal.App.4th at pp. 828-829 [elements of exemption impose independent requirements].)

Review of the determination that Heyen was not an exempt employee is a mixed question of law and fact.  (*Ramirez*, *supra*, 20 Cal.4th at p. 794.)  Whether an employee satisfies the elements of the exemption is a question of fact reviewed for substantial evidence.  (*Nordquist v. McGraw-Hill Broadcasting Co*. (1995) 32 Cal.App.4th 555, 561.)  The appropriate manner of evaluating the employee's duties is a question of law that we review independently.  (*Ramirez*, *supra*, at p. 794.)

## II. THE TRIAL COURT DID NOT APPLY AN INCORRECT LEGAL STANDARD TO DETERMINE THAT HEYEN WAS "PRIMARILY ENGAGED" IN NONEXEMPT ACTIVITIES

The parties agree that Heyen met many of the elements of the executive exemption.  They do *not* agree, however, whether Heyen was "primarily engaged" in managerial duties (Cal. Code Regs., tit. 8, § 11070, subd. 1(A)(1)(e))—i.e., whether she spent "more than one-half [her] work time" engaged in such duties (Cal. Code Regs., tit. 8, § 11070, subd. 2(K)).

24

Safeway contends the trial court erroneously concluded that Heyen spent more than 50 percent of her work time performing nonexempt tasks because it failed to properly credit plaintiff's "concurrent performance" of exempt and nonexempt duties. It urges: "Accepting as true Heyen's assertion that she personally spent several hours each day performing checking and bagging activities[,] . . . Heyen nonetheless also acknowledged that even while she was engaged in that 'hourly' work, she was at the same time still able to concurrently engage in management activities. Thus, Heyen agreed that she could work the register and still manage at the same time; that such multitasking was something that had to be done. Manager Martin similarly testified that while he was checking his 1 to 2 hours a day he never stopped managing; that he would also be able to observe and manage the front end operations including instructing and coaching other employees, changing their work station assignments, etc. Manager Lombardo likewise acknowledged that he was able to direct other employees while he was at the check stands, including answering employee questions, observing the other check stands, etc. . . . [¶] Thus, Heyen could, and did, simultaneously perform management activities during the time she was performing 'hourly work' in the front of the store and on the sales floor." (Record citations omitted.)

Based on this analysis, Safeway proposes the following standard for determining whether a manager is performing exempt or nonexempt work: "So long as the manager is still actively functioning in his/her managerial capacity, and addressing his/her attention to managerial tasks such as observing how the store is running and considering how to make the store perform more efficiently and profitably, how to best model and train the store's employees in proper service activities, how to resolve any employee or operational problems that have arisen or are arising, and instructing employees in that regard, etc., *all that time* should be considered to fall on the 'exempt' side of the ledger—

even if the manager is helping customers or handling product at the same time."[3] (Underlining omitted.)

Heyen rejects Safeway's proposed "concurrent activity" standard as inconsistent with California law. Quoting a 1993 opinion letter issued by the California Division of Labor Standards Enforcement, Heyen asserts as follows: "'[O]ne may not be "engaged in" activities which are, for instance, managerial, as required by the [Industrial Welfare Commission (IWC)]'s Orders, while at the same time "doing something else"; for it would be impossible "to involve oneself or become occupied" with managerial work while performing other duties. In other words, the IWC Orders require us to ascertain the type of work the individual is actually doing (e.g., "managerial" or "production" or "sales") and count the time on either side of the ledger.'" Therefore, Heyen suggests, where an employee "merely answers a question while stocking, he or she is not performing managerial work, but 'is "occupied or involved in" production work.'" [Citation.] In order to count as exempt work, the employee must 'clearly' disengage from the non-exempt activity and engage in the exempt activity."

We begin by examining the federal regulations incorporated by reference into Wage Order 7 and the California Supreme Court's decision in *Ramirez*. Based on these authorities, we conclude that the trial court's instructions to the jury were consistent with California law.

### A. Federal Regulations Incorporated Into Wage Order 7

Wage Order 7 provides that to be exempt from the overtime law an employee must be "primarily engaged in duties which meet the test of the exemption." The wage order defines "primarily" as "more than one-half the employee's work time" (Cal. Code Regs., tit. 8, § 11070, subds. 1(A)(1)(e), 2(K)), and it states that the activities constituting "exempt" and "nonexempt" work "shall be construed in the same manner as" such

---

[3] At oral argument, Safeway abandoned this theory, conceding that by merely observing store operations while performing nonexempt work, a manager was not functioning in his or her managerial capacity.

26

activities are construed pursuant to the federal Fair Labor Standards Act in enumerated sections of the Code of Federal Regulations, including those versions of title 29, sections 541.102, 541.108, 541.110-541.111, and 541.115 in effect in 2001.[4] We therefore turn to an examination of those sections.

The 2001 version of section 541.102 ("Management") provides that determining whether particular work is "exempt" or "nonexempt" generally "is not difficult.  In the vast majority of cases the bona fide executive employee performs managerial and supervisory functions which are easily recognized as within the scope of the exemption." (§ 541.102(a).)  Such functions include "[i]nterviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property."  (§ 541.102(b).)

Section 541.108 ("Work directly and closely related") provides that exempt work includes not only the tasks necessary for the actual management of a department and the supervision of its employees, but also tasks that are "closely associated with the performance of the duties involved in such managerial and supervisory functions or responsibilities."  (§ 541.108(a).)  The section explains:  "The supervision of employees and the management of a department include a great many directly and closely related tasks which are different from the work performed by subordinates and are commonly performed by supervisors because they are helpful in supervising the employees or contribute to the smooth functioning of the department for which they are responsible.

---

[4]    All further undesignated section (regulation) references are to title 29 of the Code of Federal Regulations.

27

Frequently such exempt work is of a kind which in establishments that are organized differently or which are larger and have greater specialization of function, may be performed by a nonexempt employee hired especially for that purpose." (*Ibid.*)

Section 541.108 cautions that in some cases it may be difficult to distinguish "managerial type" functions from "production operation[s]," and says that if work of the kind described in this section (i.e., work that is not strictly managerial or supervisory) takes up a large part of the employee's time, "it would be evidence that management of the department is not the primary duty of the employee, that such work is a production operation rather than a function directly and closely related to the supervisory or managerial duties, and that the employee is in reality a combination foreman-'setup' man, foreman-machine adjuster (or mechanic), or foreman-examiner, floorman-salesperson, etc., rather than a bona fide executive." (§ 541.108(g).) The section then provides several examples of tasks that, depending on the particular circumstances, may or may not be "directly and closely related." Those examples include the following:

"(b) Keeping basic records of working time, for example, is frequently performed by a timekeeper employed for that purpose. In such cases the work is clearly not exempt in nature. In other establishments which are not large enough to employ a timekeeper, or in which the timekeeping function has been decentralized, the supervisor of each department keeps the basic time records of his own subordinates. In these instances, . . . the timekeeping is directly related to the function of managing the particular department and supervising its employees. . . .

"(c) Another example of work which may be directly and closely related to the performance of management duties is the distribution of materials or merchandise and supplies. Maintaining control of the flow of materials or merchandise and supplies in a department is ordinarily a responsibility of the managerial employee in charge. In many nonmercantile establishments the actual distribution of materials is performed by nonexempt employees under the supervisor's direction. . . . In a large retail establishment, however, where the replenishing of stocks of merchandise on the sales floor is customarily assigned to a nonexempt employee, the performance of such work by

the manager or buyer of the department is nonexempt. The amount of time the manager or buyer spends in such work must be offset against the statutory tolerance for nonexempt work. . . .

"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(e) . . . Likewise, a department manager or buyer in a retail or service establishment who goes about the sales floor observing the work of sales personnel under his supervision to determine the effectiveness of their sales techniques, checking on the quality of customer service being given, or observing customer preferences and reactions to the lines, styles, types, colors, and quality of the merchandise offered, is performing work which is directly and closely related to his managerial and supervisory functions. His actual participation, except for supervisory training or demonstration purposes, in such activities as making sales to customers, replenishing stocks of merchandise on the sales floor, removing merchandise from fitting rooms and returning to stock or shelves, however, is not. The amount of time a manager or buyer spends in the performance of such activities must be included in computing the percentage limitation on nonexempt work."

Section 541.111 ("Nonexempt work generally") provides that "nonexempt work" "includes all work other than that described in § 541.1(a) through (d) and the activities directly and closely related to such work." (§ 541.111(a).) It explains that nonexempt work "is easily identifiable where, as in the usual case, it consists of work of the same nature as that performed by the nonexempt subordinates of the 'executive.'" (§ 541.111(b).) However, nonexempt work "is more difficult to identify in cases where supervisory employees spend a significant amount of time in activities not performed by any of their subordinates and not consisting of actual supervision and management. In such cases careful analysis of the employee's duties with reference to the phrase 'directly and closely related to the performance of the [supervisory or managerial] work . . . will usually be necessary in arriving at a determination." (*Ibid*.)

Finally, section 541.115 ("Working foremen") defines a category of "working foremen," as follows:

29

"(a)  The primary purpose of the exclusionary language placing a limitation on the amount of nonexempt work is to distinguish between the bona fide executive and the 'working' foreman or 'working' supervisor who regularly performs 'production' work or other work which is unrelated or only remotely related to his supervisory activities. . . .

"(b)  One type of working foreman or working supervisor most commonly found in industry works alongside his subordinates.  Such employees, sometimes known as strawbosses, or gang or group leaders perform the same kind of work as that performed by their subordinates, and also carry on supervisory functions.  Clearly, the work of the same nature as that performed by the employees' subordinates must be counted as nonexempt work and if the amount of such work performed is substantial the exemption does not apply. . . .  A foreman in a dress shop, for example, who operates a sewing machine to produce the product is performing clearly nonexempt work.  However, this should not be confused with the operation of a sewing machine by a foreman to instruct his subordinates in the making of a new product, such as a garment, before it goes into production.

"(c)  Another type of working foreman or working supervisor who cannot be classed as a bona fide executive is one who spends a substantial amount of time in work which, although not performed by his own subordinates, consists of ordinary production work or other routine, recurrent, repetitive tasks which are a regular part of his duties.  Such an employee is in effect holding a dual job.  He may be, for example, a combination foreman-production worker, supervisor-clerk, or foreman combined with some other skilled or unskilled occupation.  His nonsupervisory duties in such instances are unrelated to anything he must do to supervise the employees under him or to manage the department.  They are in many instances mere 'fill-in' tasks performed because the job does not involve sufficient executive duties to occupy an employee's full time.  In other instances the nonsupervisory, nonmanagerial duties may be the principal ones and the supervisory or managerial duties are subordinate and are assigned to the particular employee because it is more convenient to rest the responsibility for the first line of supervision in the hands of the person who performs these other duties."  (Italics added.)

Several general principles emerge from these regulations. First, work of the same kind performed by a supervisor's nonexempt employees generally is "nonexempt," even when that work is performed by the supervisor. If such work takes up a large part of a supervisor's time, the supervisor likely is a "nonexempt" employee. (§§ 541.108(g), 541.111(b), 541.115(b).)

Second, the regulations do not recognize "hybrid" activities—i.e., activities that have both "exempt" and "nonexempt" aspects. Rather, the regulations require that each discrete task be separately classified as *either* "exempt" or "nonexempt." (§§ 541.102(a), 541.108(a)-(g).)

Third, identical tasks may be "exempt" or "nonexempt" based on the purpose they serve within the organization or department. Understanding the manager's purpose in engaging in such tasks, or a task's role in the work of the organization, is critical to the task's proper categorization. A task performed because it is "helpful in supervising the employees or contribute[s] to the smooth functioning of the department" is exempt, even though the identical task performed for a different, nonmanagerial reason would be nonexempt. (§ 541.108(a).)

Finally, in a large retail establishment where the replenishing of stocks of merchandise on the sales floor "is customarily assigned to a nonexempt employee, the performance of such work by the manager or buyer of the department is nonexempt." (§ 541.108(c).) Similarly, in such a large retail establishment, a manager's participation in making sales to customers is nonexempt, unless the sales are made for "supervisory training or demonstration purposes." (§ 541.108(e).)

### B. *The Ramirez Case*

In *Ramirez*, *supra*, 20 Cal.4th 785, the California Supreme Court considered the "outside salesperson" exemption of section 11070, subdivision 2(I) [now, subdivision 2(J)] of title 8 of the California Code of Regulations (Wage Order 7-80), which exempted from the overtime laws any salesperson who "regularly works more than half the working

31

time" engaged in sales activities outside the workplace.[5]  There, plaintiff Ramirez was employed by Yosemite Water Company (Yosemite) as a "route sales representative."  He contended that under Wage Order 7-80, the court must tally the amount of time he spent in actual sales activity outside the workplace, as opposed to the time spent delivering products or performing services such as water cooler maintenance, to determine whether he was an "outside salesperson."  He claimed that because he spent more time delivering products than selling, he was not an exempt "outside salesperson" within the meaning of the wage order.  (*Ramirez*, *supra*, at p. 791.)  Yosemite disagreed, urging that consistent with section 541.5, when a sales/delivery person performs a dual function—in the present case, sales and delivery—the court must ascertain the employee's "primary function."  It urged that because plaintiff's "primary function" was sales, he was an outside salesperson.  (*Id.* at p. 793.)

The Supreme Court agreed with Ramirez and reversed the contrary conclusions of the trial and appellate courts.  It explained that the operative effect of the federal "outside salesperson" exemption was summarized at section 541.505(a), as follows:  "'[I]n the case of outside salesmen . . . , the employee's chief duty or *primary function* must be the making of sales or the taking of orders if he is to qualify under the definition in § 541.5.  He must be a sales[person] by occupation.  If he is, all work that he performs which is actually incidental to and in conjunction with his own sales effort is exempt work. . . .'  (Italics added.)"  (*Ramirez*, *supra*, 20 Cal.4th at p. 796.)[6]  Thus, the court said, the federal

---

[5]      The court noted that prior to the issuance of its opinion, Wage Order 7-80 had been superseded by Wage Order 7-98, but "[t]he present Wage Order does not change Wage Order No. 7-80 in any respect pertinent to the issues discussed herein.  The definition of 'outside salesperson' is unchanged."  (*Ramirez*, *supra*, 20 Cal.4th at p. 789, fn. 3.)

[6]      Section 541.505(a) (1998) provided in full:  "Where drivers who deliver to an employer's customers the products distributed by the employer also perform functions concerned with the selling of such products, and questions arise as to whether such an employee is employed in the capacity of outside salesman, all the facts bearing on the content of the job as a whole must be scrutinized to determine whether such an employee is really employed for the purpose of making sales rather than for the service and delivery

32

"outside salesperson" exemption "focuses on defining the employee's 'primary function,' not on how much work time is spent selling. . . . In other words, so long as it can be shown that the individual's chief duty or primary function is making sales, then every activity in any way incidental to sales may be funneled into the exempt category." (*Id.* at p. 797.)

In contrast, Wage Order 7-80 "makes no mention of the primary function for which the person is employed. Rather, the state regulation takes a purely quantitative approach, focusing exclusively on whether the individual 'works more than half the working time . . . selling . . . or obtaining orders or contracts.' (Wage Order No. 7-80, 2(I).)" (*Ramirez*, *supra*, 20 Cal.4th at p. 797.) By choosing not to track the language of the federal exemption and instead adopting its own distinct definition of "outside salespersons," the court said, the IWC "evidently intended to depart from federal law and to provide, at least in some cases, greater protection for employees." (*Id.* at p. 797.)[7]

---

duties which he performs and, if so, whether he is customarily and regularly engaged in making sales and his performance of nonexempt work is sufficiently limited to come within the tolerance permitted by § 541.5. The employee may qualify as an employee employed in the capacity of outside salesman if, and only if, the facts clearly indicate that he is employed for the purpose of making sales and that he is customarily and regularly engaged in such activity within the meaning of the act and this part. As in the case of outside salesmen whose jobs do not involve delivery of products to customers, the employee's chief duty or primary function must be the making of sales or the taking of orders if he is to qualify under the definition in § 541.5. He must be a salesman by occupation. If he is, all work that he performs which is actually incidental to and in conjunction with his own sales effort is exempt work. All other work of such an employee is nonexempt work. A determination of an employee's chief duty or primary function must be made in terms of the basic character of the job as a whole. All of the duties performed by an employee must be considered. The time devoted to the various duties is an important, but not necessarily controlling, element."

[7]     The court noted in a footnote that California's distinct approach to defining overtime exemptions "can also be illustrated in its treatment of the exemption for administrative, executive, and professional employees. (Cal. Code Regs., tit. 8, § 11070, subd. 1(A).)" (*Ramirez*, *supra*, 20 Cal.4th at p. 798, fn. 4.) With regard to such employees, "[t]he federal exemption for this category of employees adopts a core test which focuses on the employee's 'primary duty'; if the 'primary duty' test is met, then he

In the case before it, the evidence was "uncontroverted that Ramirez performed both sales and delivery functions for Yosemite. Delivery of preordered water bottles or the restocking of 'empties' is not a sales activity in the conventional meaning of the word—one who *only* performed these delivery tasks could not be considered a salesperson. It is true, as Yosemite points out, that failure to properly deliver the product would lead to loss of the customer, but that does not make such delivery a sales activity, any more than an attorney's preparation of a legal brief in order to satisfy and thereby retain a client is a sales activity." (*Ramirez*, *supra*, 20 Cal.4th at p. 802.) The court thus found that the trial court's review of the evidence of whether Ramirez was an outside salesperson "was tainted by an interpretation of the term that was overly favorable to finding the exemption. In other words, the record suggests that the trial court would have found Ramirez to be an outside salesperson even if it believed all of Ramirez's testimony as to how he spent his time on the job to be true, whereas a plain reading of that testimony in light of Wage Order No. 7-80, 2(I) would yield the contrary conclusion. Thus, it is unclear from the record that the court ever saw the need to resolve inconsistent testimony presented at trial." (*Ramirez*, *supra*, at p. 802.) The court therefore remanded the case for the trial court to resolve the factual discrepancies presented. (*Id.* at p. 803.)

### C.    *The Trial Court Applied the Correct Legal Standards in the Present Case*

The trial court in the present case instructed the advisory jury that it must decide whether Heyen was "primarily engaged" in exempt or nonexempt tasks as follows:

"The test to determine whether defendants have met their burden to show that plaintiff spent more than 50% of her time engaged in exempt tasks is quantitative. The

---

or she is deemed exempt regardless of how much time the individual actually spends performing the primary duty. (29 C.F.R. §§ 541.1(f), 541.2(e)(2), and 541.3(e) (1998).) By contrast, the state law exemption, as in the case of 'outside salespersons,' adopts the requirement that the employee must be 'engaged . . . primarily' in exempt work (Cal. Code Regs., tit. 8, § 11070, subd. 1(A)(1)); the term 'primarily' is defined as 'more than one-half the employee's work time.' (*Id.*, § 11070, subd. 2(J).)" (*Ramirez*, *supra*, at p. 798, fn. 4.)

test requires that, first and foremost, you must look to the actual tasks performed by plaintiff. Merely because an employee has the duty of managing is not sufficient to establish exempt status."

"If a party claims that an employee is engaged in concurrent performance of an exempt and non-exempt work, *you must consider that time to be either an exempt or a non-exempt activity depending on the primary purpose for which the employee undertook the activity at that time*. The nature of the activity can change from time to time." (Italics added.)

Safeway contends that this instruction was erroneous. It urges that store managers such as Heyen necessarily "multi-task" by engaging in "exempt" and "nonexempt" activities at the same time. In other words, while Heyen and other managers "might be checking and bagging (or doing stock work) they were also always still managing the store operations, including engaging in activities such as observing store operations and employee activities, and instructing employees in their assignments and any corrective measures that needed to be taken." By instructing the jury that it must determine whether an activity was "exempt" or "nonexempt" based on the primary purpose for which Heyen undertook it, the court "effectively [read] the concept of concurrent duties almost out of existence." Instead, Safeway suggests, the trial court should have instructed the jury that any time Heyen spent simultaneously performing "exempt" and "nonexempt" duties "should be considered to fall on the 'exempt' side of the ledger."

Although there is some intuitive appeal to Safeway's contention, it is unsupported by California law. As we have said, the federal regulations cited in Wage Order 7 expressly recognize that managers sometimes engage in tasks that do not involve the "actual management of the department [or] the supervision of the employees therein." (§ 541.108(a).) In those circumstances, the regulations do *not* say, as Safeway would have us hold, that those tasks should be considered "exempt" so long as the manager continues to supervise while performing them. Instead, the regulations look to the supervisor's *reason or purpose* for undertaking the task. If a task is performed because it is "helpful in supervising the employees or contribute[s] to the smooth functioning of the

35

department for which [the supervisors] are responsible" (§ 541.108(a), (c)), the work is exempt; if not, it is nonexempt.

Thus, the federal regulations incorporated into Wage Order 7 do not support the "multi-tasking" standard proposed by Safeway. Instead, they suggest, as the trial court correctly instructed the jury, that the trier of fact must categorize tasks as either "exempt" or "nonexempt" based on the purpose for which Heyen undertook them.

*Ramirez* similarly does not support Safeway's analysis. It was undisputed that plaintiff Ramirez performed a "dual function"—i.e., "a mixture of sales and nonsales duties." (*Ramirez*, *supra*, 20 Cal.4th at pp. 793, 789.) Yosemite proposed that, in light of Ramirez's dual responsibilities, he should be classified an outside salesperson so long as he was performing sales *at least in part*. The Supreme Court disagreed, and—much like the trial court in the present case—adopted an approach that required the trier of fact to classify each of Ramirez's tasks as either "exempt" (if the work "directly involved . . . 'selling . . . items or obtaining orders or contracts'") or "nonexempt" (if the work did not). (*Id*. at p. 797.) The court did *not* recognize a hybrid category in which the employee was deemed simultaneously to be doing both.

Safeway notes that the regulations issued by the Secretary of Labor in 2004, as well as an Advisory Bulletin issued by the Colorado Department of Labor and Employment, state that concurrent performance of "exempt" and "nonexempt" tasks does not disqualify an employee from the executive exemption if the employee is otherwise exempt.[8] While this is true, in the nine years that have passed since the Secretary of

_____

[8]     Section 541.106 currently provides as follows:
"(a) Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met. Whether an employee meets the requirements of § 541.100 when the employee performs concurrent duties is determined on a case-by-case basis and based on the factors set forth in § 541.700. Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work. In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods. An

36

Labor adopted these amended regulations, neither the California Legislature nor the IWC has elected to follow them.  We therefore have no authority to do so.

Safeway contends finally that the test created by the trial court is both vague and unworkable because it "asks the jury to peer into the mind of the manager and decide which function was more important to him or her at the time."  Safeway urges:  "Judge Mohr's test would require a fact finder to probe the moment-by-moment intellectual processes of an employee to determine whether the employee can be classified as exempt or not.  Such an analysis is neither feasible to undertake nor reflective of the fact that a manager manages on a continuing basis, even when occasionally needing to turn all of his or her attention to the task at hand."

We do not agree with Safeway that the test employed by the trial court required the fact finder to peer into Heyen's mind.  Rather, consistent with the federal regulations incorporated into Wage Order 7, it asked the fact finder to determine the objective purpose of Heyen's actions.  If such actions were taken to "supervis[e] the employees or contribute to the smooth functioning of the department," they were "exempt work"; if they were taken for some other reason, they were "nonexempt work."  (§ 541.108(a).)

---

employee whose primary duty is ordinary production work or routine, recurrent or repetitive tasks cannot qualify for exemption as an executive.

"(b)  For example, an assistant manager in a retail establishment may perform work such as serving customers, cooking food, stocking shelves and cleaning the establishment, but performance of such nonexempt work does not preclude the exemption if the assistant manager's primary duty is management.  An assistant manager can supervise employees and serve customers at the same time without losing the exemption.  An exempt employee can also simultaneously direct the work of other employees and stock shelves.

"(c)  In contrast, a relief supervisor or working supervisor whose primary duty is performing nonexempt work on the production line in a manufacturing plant does not become exempt merely because the nonexempt production line employee occasionally has some responsibility for directing the work of other nonexempt production line employees when, for example, the exempt supervisor is unavailable.  Similarly, an employee whose primary duty is to work as an electrician is not an exempt executive even if the employee also directs the work of other employees on the job site, orders parts and materials for the job, and handles requests from the prime contractor."

## III. THE TRIAL COURT DID NOT FAIL TO PROPERLY ADDRESS THE "REASONABLE EXPECTATIONS" RULE

Under California law, to determine whether an employee was properly classified as "exempt," the trier of fact must look not only to the "work actually performed by the employee during the workweek," but also to the "employer's realistic expectations and the realistic requirements of the job." (Cal. Code Regs., tit. 8, § 11070, subd. 1(A)(1)(e).) The Supreme Court discussed this rule in *Ramirez* as follows: "Having recognized California's distinctive quantitative approach to determining which employees are outside salespersons, we must then address an issue implicitly raised by the parties that caused some confusion in the trial court and the Court of Appeal: Is the number of hours worked in sales-related activities to be determined by the number of hours that the employer, according to its job description or its estimate, claims the employee *should* be working in sales, or should it be determined by the actual average hours the employee spent on sales activity? The logic inherent in the IWC's quantitative definition of outside salesperson dictates that neither alternative would be wholly satisfactory. On the one hand, if hours worked on sales were determined through an employer's job description, then the employer could make an employee exempt from overtime laws solely by fashioning an idealized job description that had little basis in reality. On the other hand, an employee who is supposed to be engaged in sales activities during most of his working hours and falls below the 50 percent mark due to his own substandard performance should not thereby be able to evade a valid exemption. A trial court, in determining whether the employee is an outside salesperson, must steer clear of these two pitfalls by inquiring into the *realistic* requirements of the job. In so doing, the court should consider, first and foremost, how the employee actually spends his or her time. But the trial court should also consider whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job." (*Ramirez*, *supra*, 20 Cal.4th at pp. 801-802.)

38

Safeway contends that in light of the "realistic expectations" rule, in order for the court to have found that Heyen was a nonexempt employee, it had to have determined that Safeway expected her to do all of the checking, bagging, merchandising, and bookkeeping work she said she did. Such a conclusion, Safeway urges, is not supported by the evidence.

We do not agree. Several witnesses (Gillette, Heyen, Reynolds, Valle, Lombardo) testified that because of Safeway's "unrealistic" expectations regarding the stores' operating ratios, a manager could not keep checkout lines as short as company policy required without doing significant nonexempt work himself or herself. Similarly, several witnesses (Gillette, Heyen, Valle, Lombardo) testified that Safeway budgeted too few hours for nonexempt bookkeepers to do the stores' books, and thus assistant managers were required to take over some bookkeeping tasks. There also was testimony that because the Oceanside store had chronic problems retaining a bookkeeper, Heyen was required to act as the store's sole bookkeeper for significant periods of time. Considered together, all of this testimony is substantial evidence that Heyen's practice of doing significant amounts of nonexempt work did not "diverge[] from [Safeway's] realistic expectations." (*Ramirez*, *supra*, 20 Cal.4th at pp. 801-802.)


## DISPOSITION


The judgment is affirmed. Heyen shall recover her appellate costs.

**CERTIFIED FOR PUBLICATION**


                                        SUZUKAWA, J.

We concur:



EPSTEIN, P. J.                          MANELLA, J.

39