Filed 2/19/14  Schreck v. Wild Oats Markets CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SEVEN

| | |
|---|---|
| CHARLES ALLEN SCHRECK et al., | B242639 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC359723) |
| v. | |
| WILD OATS MARKETS, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald M. Sohigian, Judge.  Affirmed.

Law Offices of Stephen Glick and Stephen Glick; Law Offices of Ian Herzog, Ian Herzog, Evan D. Marshall, and Susan E. Abitanta; Daniels, Fine, Israel, Schonbuch & Lebovits, Paul R. Fine, Scott A. Brooks, and Craig S. Momita for Plaintiffs and Appellants.

Jackson Lewis, Frank M. Liberatore, Henry L. Sanchez, and Sherry L. Swieca for Defendant and Respondent.

_____

Appellants Charles Schreck and John Heim worked as Assistant Store Directors for Henry's Markets, grocery stores owned and operated by respondent Wild Oats Markets, Inc. Wild Oats classified its Assistant Store Directors, including Appellants, as salaried employees exempt from the state law requirements for overtime pay. Appellants filed suit against Wild Oats for the nonpayment of overtime wages based on their alleged misclassification as exempt employees. Following a bench trial, judgment was entered against Appellants and in favor of Wild Oats. On appeal, Appellants assert that the evidence was insufficient to support the judgment against them and that the trial court committed errors of law. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.     The Complaint

Schreck and Heim were among eight plaintiffs who filed a wage and hour action against Wild Oats alleging the unlawful nonpayment of overtime wages and unfair business practices. The gravamen of the complaint was that Wild Oats misclassified each of the plaintiffs as exempt from overtime pay requirements in violation of California law. In March 2012, the claims of five plaintiffs (Assistant Store Directors Schreck, Heim, and Christopher Williamson, and Store Directors Thomas Baer and Kelvin Nettleton) proceeded to a non-jury trial. Following a 12-day trial, the trial court issued an oral statement of decision and thereafter entered a judgment in favor of Wild Oats as to each of the plaintiffs, except Williamson.[1] A summary of the relevant evidence presented at trial is set forth below.

---

[1]     Schreck sued in his capacity as both a Store Director and an Assistant Store Director, but only appeals the judgment against him as an Assistant Store Director.

## II. Plaintiffs' Evidence

### A. Charles Schreck

Schreck worked for Henry's Markets from July 2000 to February 2005 as an Assistant Store Director and then a Store Director. Each Henry's store generally employed a Store Director, an Assistant Store Director, a Third Manager, and a Fourth Manager. The Store Director and Assistant Store Director were salaried positions and the Third Manager and Fourth Manager were hourly positions. Over an 11-month period between October 2002 and August 2003, Schreck was an Assistant Store Director at Henry's Escondido and Costa Mesa stores. Schreck never saw a job description for either the Assistant Store Director or Store Director positions during his employment with Henry's.

One of Schreck's initial supervisors, Alan Bercuson, was the highest performing Store Director at Henry's. Bercuson employed an "80/20" rule under which Assistant Store Directors were expected to spend 80 percent of their time on the sales floor "doing everything that need[ed] to be done which could include merchandising, stocking, rounding carts, cashiering, pulling a load, filling dairy." Schreck testified that his role as the Assistant Store Director was to "make sure the sales floor was in impeccable condition." He also testified that he was responsible for "walking the store," which meant "doing whatever it takes to keep your store – you're facing it; you're dusting it, you're cleaning up messes, you're tagging – you're doing whatever it takes."

As the Assistant Store Director at the Escondido store, Schreck worked five days a week and approximately 40 to 50 hours a week. His direct supervisor was Thomas Baer, the Store Director, who also employed the "80/20" rule. Schreck was responsible for managing the store's grocery and dairy departments, which had a total of three or four employees. He typically worked the opening shift on the two days per week that the Store Director was not working. On the days the Store Director was absent from the store, Schreck "would run the store from the sales floor." His opening shift duties included walking through the sales floor, documenting any shelves that needed products, pulling the products from the backroom and placing them on the shelves, making sure

3

that the dairy box was stocked, faced and coded, reviewing a few e-mails, and signing off on the deposit. On the days the Store Director was in the store, Schreck's duties included stocking, building displays, cashiering, merchandising, bagging groceries, and rounding up shopping carts. Merchandising involved receiving product loads, bringing the loads into the store and breaking them down, stocking products on the shelves, cleaning up and baling the empty cardboard, and throwing the trash away. If the Store Director was not present in the store, Schreck would discipline and counsel employees as needed. He did not interview prospective employees or prepare performance appraisals, but he did provide input about employee performance to the Store Director.

As the Assistant Store Director at the Costa Mesa store, Schreck worked five to six days a week and approximately 12 to 14 hours a day. His direct supervisor was David San Miguel, the Store Director. At the Costa Mesa store, Schreck was responsible for managing the grocery department, which had a total of four to five employees. Because the Costa Mesa store was a brand new Henry's store, Schreck spend his first eight weeks at the store preparing for the opening, which primarily involved building the gondolas, receiving the products, and placing the products on the shelves. He also interviewed job applicants and provided input on the hiring of baggers and cashiers, but did not make any hiring decisions himself. Schreck had the authority to counsel and discipline employees, assisted in preparing the performance appraisals, and delivered the performance appraisals to the employees whom he directly supervised.

Schreck admitted that one of the essential duties of an Assistant Store Director was to assist the Store Director in supervising and effectively managing the store. An Assistant Store Director was responsible for supervising the employees who worked in the grocery department, and for ensuring the accuracy and accountability of all invoices and expenses for the grocery department. An Assistant Store Director also was responsible for ordering products from authorized vendors, managing inventory to avoid overstocked and out-of-stock products, making sure the products were accurately priced and properly placed on the shelves, and notifying the Store Director of any customer complaints or employee personnel issues. An Assistant Store Director, Schreck

performed some paperwork, which generally consisted of reviewing e-mails, signing off on the deposit, writing orders, and sending orders. The Store Director typically was off work two days a week, and on those days, Schreck would assume the Store Director's duties.

Schreck admitted that he supervised employees while he worked on the sales floor. He also trained employees on how to perform certain tasks by physically doing the task himself and showing them how it should be done. Schreck testified that he had the authority to delegate non-management tasks such as stocking to hourly employees, but often could not do so because no one else was available to perform that work. As Schreck explained, "[i]f you have got 15 pallets of product in the back and it's you and another associate, am I just going to direct him to do all the work himself? So the point is that no, it's me and someone else getting the work done."

Schreck testified that he received overall ratings of "Exceeds Expectations" in his performance appraisals. In his January 2003 performance appraisal, it was noted that Schreck had been "instrumental in cleaning [and] maintaining the store," and was "always trying to get others involved in building displays, decorating, etc." The appraisal also stated that Schreck should "focus on more wall to wall," which he was told meant spending "more time in the departments," being "an extra helping hand in those departments," and doing "anything from making French bread, to sandwiches, to cutting cheese, stocking fruit, dairy box." Schreck was never disciplined or criticized by his supervisors for spending too much time on non-management tasks or for not spending enough time on management tasks. He voluntarily resigned from Henry's in February 2005 because he was frustrated with not being compensated for all of the hours that he worked.

### B. John Heim

Heim was an Assistant Store Director at Henry's Markets over a 16-month period between September 2003 and January 2005. He worked an average of 50 to 60 hours a week. As an Assistant Store Director, Heim was responsible for the grocery, dairy,

frozen, bulk, and beer and wine departments.  He directly supervised the Third and Fourth Managers and approximately five grocery clerks.  Heim never saw a job description for his position during his employment with Henry's.

Heim's direct supervisor was the Store Director who in turn reported to a District Manager.  Heim's District Manager, Alan Bercuson, had an "80/20 rule," as described.  As described by Heim, duties on the sales floor consisted of cashiering, stocking, filling in for absent employees, and doing any other physical work that the job required.  When Heim worked the opening shift, his daily tasks included checking in with the department heads, walking through the sales floor, receiving and unloading deliveries, stocking products on the shelves, and facing products on the shelves.  Heim, along with the Third and Fourth Managers, also had the authority to order products for the grocery and dairy departments from authorized vendors.  Heim did not have the authority to set prices for products, choose what products to carry, select product vendors, or set labor budgets for the store.

Heim admitted that an Assistant Store Director had some managerial duties.  He also admitted that he performed the majority of those duties on the sales floor including training, supervising, counseling and delegating work to subordinate employees.  Heim prepared the performance appraisals for some employees and estimated that he would spend an average of 15 to 20 minutes preparing an appraisal and a short amount of time delivering it to the employee.  Heim provided input to the Store Director for other performance appraisals and had authority to make recommendations on promotions and demotions.  Heim also was responsible for managing loss prevention and shrinkage issues for the grocery department, preparing sales reports and margin reports for the grocery department, inputting sales figures in the general ledger, inspecting product shipments for quality assurance purposes, ensuring regulatory compliance for the store, reviewing inventory on a monthly basis, ordering products on a daily basis, reviewing e-mails twice a day, and occasionally preparing employee schedules.  Heim participated in weekly management meetings, in monthly Associate Store Director

6

conference calls, and in quarterly store meetings. Heim regularly took meal and rest breaks, but his rest breaks were often interrupted by employees with work-related issues.

Heim acknowledged that, as an Assistant Store Director, he was second in command at the store and would assume the duties of the Store Director when the Store Director was not there. The Store Director typically was off work two of the five days a week that Heim was in the store. On the days that both Heim and the Store Director were scheduled to work, their shifts generally overlapped three to six hours. Although Heim became the highest ranking employee in the store whenever the Store Director was absent, he stated that his job responsibilities did not significantly change. Heim testified that he spent 80 to 90 percent of his time as an Assistant Store Director on physical tasks and "very little" time on management duties. Heim also explained that he had the authority but "not necessarily the ability" to delegate tasks to subordinate employees.

Heim testified that, during his tenure as an Assistant Store Director, he was criticized by his supervisors for performing too much office work. In January 2004, Heim was placed on a disciplinary action plan that stated, in part: "The attitude you project is that you are better than everyone else, and since you are the assistant, you don't have to get your hands dirty! Respect is earned; it is not given. You need to learn that you are only as good as the staff makes you!" The action plan also stated: "You spend too much time in the office. You need to spend more time in the sales floor helping with the daily operations, check your mailbox, sales and labor, and head to the sales floor." In issuing the action plan, Heim's Store Director told him that he needed to be more hands-on with the staff by physically performing the work with them.

In November 2004, Heim was issued a disciplinary warning for failing to follow instructions on an inventory project. On that occasion, the Store Director had ordered Heim and another Assistant Store Director to inventory all discontinued store items, remove those products from the shelves, and set them aside in the back room. In December 2004, Heim was issued another disciplinary warning for failing to complete a list of stocking-related tasks that had been assigned to him. In a December 2004 meeting, Heim's Store Director told him that he needed to improve his job performance. Heim

was instructed at that time to delegate as much as possible to accomplish his tasks and to follow up with his staff to make sure the work was properly done. In January 2005, Heim was demoted to a Third Manager, but testified that the change in position was made at his request because he was working too many hours as an Assistant Store Director. Heim voluntarily resigned from his employment with Henry's in 2006.

### C. Christopher Williamson

Christopher Williamson was an Assistant Store Director at Henry's Markets from 2000 to 2003. The Santee store where Williamson worked had a total of 50 to 60 employees and an annual sales volume of approximately $9 million. Prior to becoming an Assistant Store Director, Williamson held the hourly positions of Third and Fourth Manager, and testified that the job duties of a Third and Fourth Manager were essentially the same as the duties of an Assistant Store Director. Williamson never saw a job description for the Assistant Store Director position during his employment with Henry's.

As an Assistant Store Director, Williamson worked five days a week and 10 to 11 hours a day. He testified that he typically would start his shift by spending 20 minutes walking around the store and documenting any shelves that needed products. He then would retrieve those products from the back room and stock them on the shelves. Williamson walked through the store three times a day, and during those walks, he would talk to the department managers about any store issues that arose. During his shift, Williamson also would receive product loads, break down the loads and stock them on the shelves or in the back room, remove any expired products from the shelves, refill any empty shelves with additional products, and keep products facing forward on the shelves. As the store became busier with customers, he would assist with cashiering and bagging groceries. Williamson delegated work to other store employees, including the Third and Fourth Managers, but he could not assign all non-management tasks to the hourly staff. Instead, the employees "all just pitched in, did whatever it took to just keep the store going, [made] sure the product was filled and the store looked nice for our guests."

On a daily basis, Williamson would spend one to two hours ordering products for the grocery, dairy, and frozen departments. The Third and Fourth Managers also had the authority to order products and did so regularly. Williamson was responsible for completing other paperwork as needed, including temperature logs, invoice logs, inventory logs, and merchandise transfer forms. When the Store Director was out for a period of time, Williamson prepared the weekly schedules for certain employees, but he did not otherwise handle scheduling. He coached employees if he saw them incorrectly performing a task and issued a couple of disciplinary warnings. He also conducted screening interviews for job applicants, made hiring recommendations to the Store Director, and prepared a few performance appraisals. Williamson estimated that he would spend an average of 20 minutes writing a performance appraisal and five to 20 minutes delivering it to the employee. He did not have the authority to set labor budgets, choose what products to carry, set prices for the products, or select product vendors. When the Store Director was out, Williamson was the highest ranking person in the store and was responsible for the supervision of all store employees. He nevertheless stated that his job responsibilities during those times were simply to "make sure nothing fell apart" and to be "a placeholder until [the Store Director] got back."

Williamson was counseled at times about his job performance and was placed on a 30-day performance improvement plan in February 2003. He testified, however, that he was never criticized by his supervisors for spending too much time on non-management tasks. Instead, his district manager told Williamson on more than one occasion that he needed to spend more time stocking the shelves, cleaning and dusting the store, and doing whatever it took to make the store look good. Williamson voluntarily resigned from Henry's in October 2003.

### D.    Thomas Baer

Thomas Baer, another plaintiff in this case, was a Store Director at Henry's Markets from 2000 until his termination in 2004. Baer managed the Escondido store during the time Schreck and Heim each worked at the store as the Assistant Store

Director. During Baer's tenure as a Store Director, the Escondido store had a total of 50 to 80 employees and an annual sales volume of approximately $14 million.

Baer and Schreck were scheduled to work in the store on the same days three to four days a week, but they usually had different shifts on those days. Baer testified that Schreck's main duty as an Assistant Store Director was to manage the grocery department, which consisted of ordering products, working loads, cashiering, and cleaning. Although Baer could have assigned an hourly employee to clean or round up carts, it would have required a manager to take over that employee's tasks since no one else was available to do his or her work. According to Baer, Schreck spent less than 20 percent of his time performing managerial duties such as preparing performance appraisals, interviewing job applicants, writing schedules, training and delegating tasks to employees, counseling and disciplining employees, and reviewing profit and loss reports. Baer stated that Schreck was a hard worker who did well on his performance appraisals and met Baer's expectations as an Assistant Store Director.

Baer and Heim worked in the store on the same days three to four days a week, but their shifts typically did not overlap. Baer testified that Heim was responsible for managing the grocery department and his duties included stocking products, facing products, and working loads. Baer expected Heim to spend 20 percent of his time on managerial tasks and 80 percent of his time on physical work. At times, Baer observed Heim supervising, training, and delegating work to employees. Heim also met Baer's expectations as an Assistant Store Director.

In Baer's January 2004 performance appraisal as a Store Director, it was noted that his "financial accounting [was] good," but he needed to "[d]elegate some of this down and concentrate on being on the sales floor." It also was noted that Baer's "[f]loor time seems limited," and that he should "[d]elegate more and let your staff see you giving 'GREAT' customer service." In discussing the appraisal, Baer's direct supervisor, Bercuson, advised him that he needed to spend more time assisting customers, cashiering, bagging, and doing "whatever it took . . . so the customers knew that we were taking care of them."

### E. Bryan Reed

Bryan Reed worked for Henry's Markets from 1996 to 2005 and was the Store Director at the Santee store during the time that Heim was the Assistant Store Director. The Santee store had 40 employees and was organized into different departments, including grocery, bakery, deli, produce, meat, and vitamins. Each department was managed by a department head, which was an hourly position, except for the grocery department which was managed by the Assistant Store Director.

Reed testified that Alan Bercuson, who was then a district manager, had the "80/20" rule described by other witnesses. Sales floor duties included stocking products on the shelves, facing products on the shelves, building displays, cashiering, and providing customer service. As described by Reed, Bercuson wanted Store Directors to "spend the bulk of your time on the sales floor . . . working alongside the staff, . . . showing that you were willing to get your hands dirty. . . ." Reed acknowledged, however, that time spent on the sales floor also would include supervising the functions of the sales floor and ensuring that the store was running properly.

Reed testified that Heim spent the "vast majority" of his time as an Assistant Store Director doing physical as opposed to managerial work. Reed estimated that Heim spent 90 percent of his time on "floor physical type of duties," such as stocking products, facing products, and cashiering. Reed admitted that an Assistant Store Director was second in command at the store with supervisory duties and that Heim's duties on the sales floor included supervising employees and making sure the store was running properly. Reed explained, however, that "there's probably only so much time you can spend directing somebody and overseeing, and realistically as an Assistant Store Director with responsibilities of the grocery manager, you would really be spending the predominant amount of that time, you know, writing your orders, working your loads, stocking your shelves, and you would certainly direct people while you were doing those things. But, you know, the majority of your time was going to be . . . spent, you know, working his department that he was responsible for."

11

During Heim's tenure at the Santee store, the grocery department consisted of Heim, a Third Manager, and a Fourth Manager. Heim had supervisory authority over the Third and Fourth Managers and provided input about their performance, but he did not prepare their performance appraisals. Reed stated that Heim met his expectations during the short period of time that he was an Assistant Store Director under Reed's supervision. Reed previously had sued Wild Oats and was a personal friend of two of the plaintiffs in this case.

### F.     Alan Bercuson[2]

Alan Bercuson worked at Henry's Markets from approximately 1993 to 2005. He was a Store Director at the Encinitas store until 2002 when he was promoted to an Area Director. As a Store Director, Bercuson worked 12 hours a day and six days a week. As an Area Director, Bercuson was responsible for supervising 20 different stores. He typically would spend a half day in each store observing the operations of the store and the work of the managers who reported to him. In 2001, after Wild Oats purchased the Henry's stores, there was a change in expectations concerning store performance and conditions. Wild Oats expected store management to reduce labor costs, increase sales revenues, and improve the overall conditions of the stores.

Each store had a policy manual that contained job descriptions for the Store Director and Assistant Store Directors. According to Bercuson, those job descriptions accurately identified the essential duties of each position. There was no written policy concerning how much time a Store Director or Assistant Store Director should spend in the office versus on the sales floor. However, Wild Oats expected its managerial employees to be on the sales floor as much as possible and to manage the store by walking around, observing the store, and making an action plan for the work that needed to be done. Bercuson testified that the managers needed to be on the sales floor to

---

**2**     Bercuson was called as an adverse witness by the plaintiffs pursuant to Evidence Code section 776.

observe and supervise the staff, to determine what products needed to be ordered and stocked, and to address any customer service issues that would arise. The managers also needed to check in with the department heads throughout the day to assess how the departments were operating and to provide them with feedback and direction. At times, the Store Directors and Assistant Store Directors were expected to manage the store by performing some of the physical tasks themselves. When needed, the managers were expected to greet customers, cashier, bag groceries, and take groceries to the customers' cars.

In a disciplinary action plan that Bercuson issued to one Store Director, he told her to "be careful not to delegate too much" and that the "staff needs to see you on the floor working side by side with them, especially the front end." He also instructed the Store Director to hold weekly meetings with the department managers and to follow up with each department to ensure that there was clear and consistent communication throughout the store. In a performance appraisal that Bercuson prepared for that same Store Director, he again advised her not to "delegate too much" and to "[b]e willing to jump in and help out wherever and whenever you are needed in the store, especially the front end." He also commented that "[a]s a Store Director, there is no such thing as 'not my job,'" and she should not "give the impression that tasks like bagging groceries or checking are beneath [her]."

Bercuson confirmed that he wanted the Store Directors to spend their time on the sales floor and to assist with cashiering and bagging groceries when needed. He testified, however, that he never instructed the Store Directors or Assistant Store Directors that they had to perform specific non-managerial tasks. He simply "wanted them walking around and making sure their store was up." As described by Bercuson, if the managers "wanted to go up and bag because they were short a bagger, the philosophy of the company was the customer is the most important thing. And what we used to say is that the customer signs your paycheck. So if you've got to go up and help bag, then go up and help bag, and if you have to go shag carts because the bagger called in sick, you've to

13

do what you have to do. . . . But there was never the policy, never any directive that came from me saying, you know, you have to throw loads."

When asked whether he directed the plaintiffs to perform non-managerial work themselves or to inspect the work performed by others, Bercuson answered: "I think they had to do a little bit of both. . . . I think we want everybody to be out there. And if there was a little bit of both, you had to do what you had to do at times. If somebody was sick or somebody was late for work and then the milk box is empty, well, yeah, go in there and fill the milk because there's no milk for our customers. And I think at the end of the day, in retail, that's a manager. . . ." When asked to estimate how much time the plaintiffs spent on managerial versus non-managerial work, Bercuson stated: "It's kind of hard, I'll be honest with you, because when I would go into the store there would be some managers that would be on the floor working, you know, walking, talking, some might be stocking because if the load got there late or there's somebody that called in sick and they couldn't cover their shift so they were stocking the dairy box or doing something like that; there were some managers I would get there they would be in the office, they would be doing re-does, they would be doing some paperwork, checking e-mails." Bercuson also testified that it was difficult to assign a percentage value to how the plaintiffs spent their time because a manager in the grocery business had to be a "jack-of-all-trades" and "every day is never the same."

### G. Joann Stonebarger

Joann Stonebarger was employed by Henry's Markets as a Training Coordinator. In this position, Stonebarger attended Store Director meetings led by Bercuson, who was then a Director of Operations. Stonebarger testified that Bercuson had an "80/20" rule under which Store Directors were expected to spend 80 percent of their time "working hand-in-hand with [their] employees out on the floor to gain their respect" by performing such tasks as "bagging groceries, cashiering, [and] stocking." Bercuson explained to the Store Directors that gaining the respect of the employees meant showing them that "you would be willing to do the same job as them" regardless of the task. As described by

14

Stonebarger, Bercuson wanted the Store Directors "to do whatever it took to get the job done, and their labor was tight." When Henry's Markets became a division of Wild Oats, the labor budgets for the stores were significantly cut and "salaried personnel were expected to do stuff that normally they wouldn't be doing."

## III. Defense Evidence

### A. Robert Oberlin

Robert Oberlin was employed by Henry's Markets for approximately 15 years and worked as both an Assistant Store Director and a Store Director. He was an Assistant Store Director for two of the plaintiffs, Baer and Nettleton, during the time that they were Store Directors. He did not work with either Schreck or Heim. Oberlin was given a job description for his positions when he was promoted to an Assistant Store Director and then a Store Director. He testified that the job descriptions accurately identified the essential duties of each position and that he performed those duties during his employment with Henry's. He acknowledged, however, that there were other duties not included in the job descriptions that a salaried manager was required to perform.

As described by Oberlin, Henry's stores were open for 14 hours each day. The Store Director typically worked the opening shift and the Assistant Store Director worked the closing shift. As an Assistant Store Director, Oberlin's schedule overlapped with the Store Director's schedule three days a week. Oberlin usually started his shift around 1:30 p.m. and the Store Director finished his shift around 5:00 p.m. The Store Director would "pass the baton" to Oberlin at the end of his shift, and Oberlin would "take over from where he left off and finish off the day to maintain things properly." Both the Store Director and Assistant Store Director were scheduled to work 10 hours per day. Oberlin stated that the stores where he worked were properly staffed and the scheduled hours for the salaried managers provided sufficient time for them to perform their job duties.

Oberlin testified that the job duties of a Store Director and Assistant Store Director were essentially the same and that he performed the same duties in each position. He also testified that he spent the majority of his time as a Store Director on managerial tasks

15

which included walking through the store, talking to the department managers, reviewing logs, making sure reports were completed, participating in weekly conference calls, attending meetings, and scheduling reviews. Oberlin estimated that it would take a minimum of two hours for him to walk through the store, observe what work needed to be done, and provide the department managers with direction. He also coached and counseled employees based on his observations of their performance on the sales floor.

As a Store Director, Oberlin did not stock shelves or break down loads. He explained that if he found himself spending too much time on non-managerial tasks, he would need to evaluate whether he was scheduling the proper amount of staffing for the store and whether he should make adjustments to the employees' schedules. Oberlin admitted that his duties as a Store Director at times included greeting customers, assisting them in finding products, cashiering, and bagging groceries. However, Oberlin considered those tasks to be managerial as well because they were part of training employees and providing good customer service.

###### B. Cynthia Chikahisa

Cynthia Chikahisa was a Store Director for Wild Oats from 1993 to 2003. She became an Assistant Director of Operations in 2003 and a Director of Operations in 2004. As a Director of Operations, Chikahisa oversaw the Wild Oats and Henry's stores in California and was responsible for the operations and performance of those stores. Each Wild Oats and Henry's store had a binder that contained a job description for every position in the store, including the Store Director and Assistant Store Director positions. In 2007, Wild Oats was acquired by Whole Foods Markets and the Henry's stores later were sold to Sprouts Farmers Markets.

As a Store Director for Wild Oats, Chikahisa worked at the Long Beach, Pasadena, Mission Viejo, and Laguna Beach stores. According to Chikahisa, Store Directors were expected to work 10 hours a day five days a week and typically worked the opening shift. Store Directors were responsible for overseeing the operations of the store, ensuring its presentation and safety, and managing its sales, labor, and expenses.

Their job duties included hiring, training, coaching, counseling, disciplining and discharging employees. Store Directors also prepared the performance appraisals and work schedules for various employees, and reviewed the appraisals and schedules that the department managers prepared for other employees. "Walking the store" as a Store Director entailed walking through the entire store, talking to the department managers, delegating work to employees, and ensuring that the work was properly done.

Chikahisa testified that she understood the difference between managerial and non-managerial duties and that she spent the majority of her time as a Store Director for Wild Oats performing managerial duties. She also testified that Store Directors at the Wild Oats stores had the same job expectations as Store Directors at the Henry's stores, and that Store Directors who spent more than one-half of their time on non-managerial tasks would not be meeting expectations. The labor budget for each store was 10 to 13 percent of its sales, which Chikahisa stated was sufficient for Store Directors to staff their stores with enough hourly employees and to spend the majority of their time performing managerial work. Store Directors also had the discretion to allocate payroll hours among the departments based on business needs and to increase labor costs if the store's sales increased. Chikahisa acknowledged there were significant differences in the job expectations for Store Directors and Assistant Store Directors. She also admitted that, during her tenure as a Wild Oats Store Director, she did not have any personal knowledge as to how the Henry's Store Directors were directed to manage their stores.

### C. Documentary Evidence

The defense offered into evidence written job descriptions for the Store Director and Assistant Store Director positions at Henry's Markets. As set forth in the Assistant Store Director job description, the essential duties of the position included the following: (1) "Assist the Store Director in effectively supervising, directing and managing all of the functions and activities of store operations in a manner designed to obtain maximum sales and margins, [and] to control labor and expenses within budget." (2) "In the absence of the Store Director assume the duties and responsibilities of the Store Director

17

position." (3) "Maintain retail prices at and agreed upon overall gross margin percent; order products from authorized vendors; [i]nsure inventory control to avoid 'out-of-stocks' and/or 'over-stocks'; [i]nsure all products are accurately priced and that price changes and sales prices are maintained up to date; assure control, accuracy and accountability of all invoices and expenses; contribute to the financial best interest of the store in a manner designed to achieve established sales and profit goals; observe shift operation hours[;] write and/or approve Grocery Department schedule." (4) "Greet and assist customers in a friendly and courteous manner and respond positively to customer's questions, special orders, suggestions and any complaints." (5) "Effectively train, direct, motivate and supervise department personnel." (6) "Notify the Store Director of customer and personnel situations and policy violations having an adverse effect on the department or the store's operating performance." (7) "Maintain a high level of product knowledge[;] [s]ell and cross sell products; [a]dhere to receiving policies and procedures." and (8) "Adhere to all Health Department, Steritech, OPE and sanitary considerations."

The defense also offered into evidence various employee personnel documents that were either prepared or approved by the plaintiffs in their capacity as Store Directors or Assistant Store Directors. As to Heim, the documents included 27 performance appraisals, 17 disciplinary warnings, and 12 miscellaneous forms prepared during the relevant 16-month period when Heim was an Assistant Store Director. As to Schreck, the documents included 15 performance appraisals, 5 disciplinary warnings, and 11 miscellaneous forms prepared during the relevant 11-month period when Schreck was an Assistant Store Director. The defense further offered into evidence the weekly schedules for the Escondido store where Heim worked as an Assistant Store Director.

## IV. The Statement of Decision

On March 27, 2012, the trial court issued an oral statement of decision pursuant to California Rules of Court, rule 3.1590(c)(1). As to Schreck and Heim, the court found in favor of Wild Oats on the basis that each of them spent more than half of their time on

18

management functions.[3] As to Williamson, the court found in favor of Williamson on the basis that he spent more than half of his time on nonexempt functions and was entitled to overtime compensation.

In setting forth the legal basis for its ruling, the trial court cited to Labor Code section 515, Industrial Welfare Commission Wage Order 7-2001, and the California Supreme Court's decision in *Ramirez v. Yosemite Water Co., Inc.* (1999) 20 Cal.4th 785 (*Ramirez*). The trial court expressly noted that it had employed the methodology described in *Ramirez* and had applied California's "quantitative approach" to its exemption analysis by determining whether "the employee worked more than half of his or her working time on exempt duties." The court also noted that it had considered the specific factors enumerated in *Ramirez* concerning how the employee actually spent his or her time, whether the employee's practice diverged from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over the employee's performance, and whether any such expressions were realistic given the actual overall requirements of the job.

In explaining the factual basis for its ruling, the trial court made the following findings of fact: (1) Wild Oats's job descriptions for the Store Director and Assistant Store Director positions were not false or made in bad faith; (2) the plaintiffs' witnesses underestimated the time devoted to certain tasks and misconstrued certain documents, including the performance appraisals and disciplinary warnings prepared by Schreck and Heim; (3) Wild Oats's job classifications for the plaintiffs were "valid and accurate"; (4) the instructions to the plaintiffs to be "on the [sales] floor" were not instructions to perform manual, physical, and nonexempt work; (5) the documentary evidence showed that Schreck, Heim, and Williamson were not instructed to spend more than half of their time on nonexempt work, but rather "were admonished to devote time and attention to exempt work, and they did so"; (6) the job descriptions and assignments for the Assistant

---

[3]     The trial court also found against Baer and Nettleton on the basis that they spent more than half of their time as Store Directors on exempt work.

19

Store Directors had "a firm basis in reality" and "the realistic requirements of the job were to be a second-in-command manager" of stores that were "significant economic operations involving the management of a relatively large number of employees which required . . . knowing and on-the-spot management"; (7) although Schreck, Heim, and Williamson performed some nonexempt work, "they were not instructed to do that over and above their management functions" and "they understood that"; (8) Schreck and Heim "were fully aware of the distinction between management and non-management functions" and "drew on those distinctions in giving instructions to their subordinates"; and (9) Schreck and Heim "have been shown to have spent more than half their time on management functions." The court recognized that there was a conflict in the evidence concerning what kind of work the plaintiffs spent the majority of their time performing, and stated that it had made its factual findings based on the totality of the record after weighing the evidence.

## V.     The Post-Trial Proceedings

On May 3, 2012, the trial court entered a judgment in favor of Wild Oats and against Schreck and Heim on each of their claims. Schreck and Heim thereafter jointly filed a motion for a new trial on the grounds that the evidence was insufficient to support the judgment against them and that the trial court made errors of law in its statement of decision. With respect to the alleged errors of law, Schreck and Heim argued that the trial court erroneously shifted the burden to them to establish that they spent the majority of their time on exempt work, and improperly relied on defense counsel's argument in making its findings rather than requiring Wild Oats to prove the exemption with admissible time and task evidence. On July 17, 2012, following the trial court's denial of their motion, Schreck and Heim filed a timely notice of appeal.

**DISCUSSION**

Appellants raise two principal arguments on appeal. First, they contend that the trial court committed errors of law because it failed to employ California's quantitative approach to determining the applicability of the claimed exemption. They assert the court was required to first classify each task performed by Appellants on a week-by-week basis as exempt or nonexempt and then calculate the amount of time that they spent on each of those tasks. Second, they claim that the evidence at trial was insufficient to support the judgment against them because Wild Oats failed to meet its burden of proving each element of the exemption with admissible "time and task" evidence to show the actual amount of time that Appellants spent on exempt versus nonexempt tasks.

## I.     Overview of the Executive Exemption

Under California law, employees are entitled to overtime pay for any work in excess of eight hours in one workday, or 40 hours in any one workweek, unless the employee qualifies for a statutory exemption from the state's overtime laws. (Lab. Code, §§ 510, 515; *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 324.) In light of the remedial nature of laws regulating the wages, hours, and working conditions of employees, "exemptions from statutory mandatory overtime provisions are narrowly construed." (*Ramirez*, *supra,* 20 Cal.4th at p. 794.) Additionally, because "the assertion of an exemption from the overtime laws is considered to be an affirmative defense, . . . the employer bears the burden of proving the employee's exemption." (*Id*. at pp. 794-795.)

Appellate review of a trial court's determination that an employee was properly classified as exempt from statutory overtime requirements involves a mixed question of law and fact. (*Ramirez*, *supra*, 20 Cal.4th at p. 794.) "Whether an employee satisfies the elements of the exemption is a question of fact reviewed for substantial evidence. [Citation.] The appropriate manner of evaluating the employee's duties is a question of law that we review independently. [Citation.]" (*Heyen v. Safeway Inc.* (2013) 216 Cal.App.4th 795, 817 (*Heyen*).)

21

## A. California's Wage Order 7

California's Industrial Welfare Commission (IWC) promulgated Wage Order No. 7-2001, codified at California Code of Regulations, title 8, section 11070 (Wage Order 7), to regulate the wages, hours, and working conditions in the mercantile industry.[4] Wage Order 7 generally requires employers to pay overtime compensation to employees (*id*., subd. 3(A)), but exempts from this requirement "persons employed in administrative, executive, or professional capacities" (*id*., subd. 1(A)). "A person employed in an executive capacity means any employee: [¶] (a) Whose duties and responsibilities involve the management of the enterprise in which he/she is employed or of a customarily recognized department or subdivision thereof; and [¶] (b) Who customarily and regularly directs the work of two or more other employees therein; and [¶] (c) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight; and [¶] (d) Who customarily and regularly exercises discretion and independent judgment; and [¶] (e) Who is primarily engaged in duties which meet the test of the exemption." (*Id*., subd. 1(A)(1).) The term "primarily" is defined in the wage order as "more than one-half of the employee's work." (*Id*., subd. 2(K).)

## B. The Applicable Federal Regulations

Wage Order 7 states that the activities constituting exempt work and nonexempt work shall be construed in the same manner as such activities are construed in certain regulations in effect as of January 1, 2001 under the Fair Labor Standards Act, specifically Title 29 of the Code of Federal Regulations, sections 541.102, 541.104-111,

---

[4] "The IWC was the state agency empowered to formulate regulations (known as wage orders) governing minimum wages, maximum hours, and overtime pay in California. The IWC promulgated 15 wage orders, applying to separate industries, which each follow a similar format. [Citation.]" (*Heyen*, *supra*, 216 Cal.App.4th at p. 816, fn. 2.)

22

and 541.115-116. (Cal. Code Regs., tit. 8, § 11070, subd. 1(A)(1)(e).) The applicable federal regulations define exempt work performed by a bona fide executive employee as including "[i]nterviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the men and the property." (29 C.F.R. § 541.102(b) (2000).)

The federal regulations further provide "that exempt work includes not only the actual management of the department and the supervision of the employees therein, but also activities which are closely associated with the performance of the duties involved in such managerial and supervisory functions or responsibilities. The supervision of employees and the management of a department include a great many directly and closely related tasks which are different from the work performed by subordinates and are commonly performed by supervisors because they are helpful in supervising the employees or contribute to the smooth functioning of the department for which they are responsible." (29 C.F.R. § 541.108(a) (2000).) The regulations caution, however, that in some cases it may be difficult to distinguish between "managerial type" functions and "production operation" functions, and that if production work "takes takes up a large part of the employee's time[,] it would be evidence that management of the department is not the primary duty of the employee, [and] that such work is a production operation rather than a function directly and closely related to the supervisory or managerial duties. . . ." (*Id.*, § 541.108(g).)

As our colleagues in Division Two of this court recently explained, "[s]everal general principles emerge from these regulations. First, work of the same kind performed

by a supervisor's nonexempt employees generally is 'nonexempt,' even when that work is performed by the supervisor. If such work takes up a large part of a supervisor's time, the supervisor likely is a 'nonexempt' employee. [Citations.] [¶] Second, the regulations do not recognize 'hybrid' activities – i.e., activities that have both 'exempt' and 'nonexempt' aspects. Rather, the regulations require that each discrete task be separately classified as *either* 'exempt' or 'nonexempt.' [Citations.] [¶] Third, identical tasks may be 'exempt' or 'nonexempt' based on the purpose they serve within the organization or department. Understanding the manager's purpose in engaging in such tasks, or a task's role in the work of the organization, is critical to the task's proper categorization. A task performed because it is 'helpful in supervising the employees or contribute[s] to the smooth functioning of the department' is exempt, even though the identical task performed for a different, nonmanagerial reason would be nonexempt. [Citation.] [¶] Finally, in a large retail establishment where the replenishing of stocks of merchandise on the sales floor 'is customarily assigned to a nonexempt employee, the performance of such work by the manager or buyer of the department is nonexempt.' [Citation.] Similarly, in such a large retail establishment, a manager's participation in making sales to customers is nonexempt, unless the sales are made for 'supervisory training or demonstration purposes.' [Citation.]" (*Heyen*, *supra*, 216 Cal.App.4th at pp. 822-823.)

### C. The *Ramirez* Factors

In *Ramirez*, the California Supreme Court considered the appropriate method of analyzing the outside salesperson exemption from the state's overtime laws. The Court held that the governing IWC Wage Order "incorporate[d] a quantitative method for determining whether an employee is an outside salesperson that differs in some respect from the qualitative method employed under federal law." (*Ramirez*, *supra*, 20 Cal.4th at p. 798.) The Court noted that "[t]he IWC's distinct approach to defining categorical overtime exemptions can also be illustrated in its treatment of the exemption for administrative, executive, and professional employees. [Citation.] The federal exemption for this category of employees adopts a core test which focuses on the

24

employee's 'primary duty'; if the 'primary duty' test is met, then he or she is deemed exempt regardless of how much time the individual actually spends performing the primary duty. [Citation.] By contrast, the state law exemption . . adopts the requirement that the employee must be 'engaged . . . primarily' in exempt work [citation]; the term 'primarily' is defined as more than one-half the employee's work time.' [Citation.]" (*Ibid.*, fn. 4.)

The *Ramirez* decision also addressed whether, under California's distinctive quantitative approach, the applicability of the outside salesperson exemption must be determined by the number of hours that the employer claims the employee should be performing exempt work or by the actual average hours that the employee spends performing exempt work. The Supreme Court directed the trial courts to inquire "into the *realistic* requirements of the job. In so doing, the court should consider, first and foremost, how the employee actually spends his or her time. But the trial court should also consider whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job." (*Ramirez*, *supra*, 20 Cal.4th at p. 802.) Following *Ramirez*, the IWC incorporated these factors into Wage Order 7 for the executive exemption. (Cal. Code Regs., tit. 8, § 11070, subd. 1(A)(1)(e).)

## II.     Alleged Errors of Law

In their appeal, Appellants first argue that the trial court made errors of law in its statement of decision that require reversal of the judgment against them. In particular, they contend that the trial court failed to perform the proper legal analysis under *Ramirez* because the court did not "look at each task, determine the amount of time it took, and put that on one side or the other of the exempt/nonexempt ledger." They also claim that the trial court "impermissibly relied upon defense counsel's argument, the 'manager' label, and the AD job description . . ., none of which answers the time and task inquiry required in *Ramirez* or establishes that Wild Oats properly classified Appellants as

exempt employees." Appellants reason that these alleged errors reflect that the trial court improperly made its exemption determination by applying the federal qualitative test, which focuses on the employee's primary duty, rather than California's quantitative test, which focuses on how the employee actually spent his or her time. Based on our review of the record, we conclude that Appellants have failed to affirmatively demonstrate any legal error in the trial court's ruling.

A fundamental rule of appellate review is that an appealed judgment is presumed correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) "'All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. . . . [Citations.]'" (*Ibid.*) Additionally, under the doctrine of implied findings, the appellate court must infer that the trial court made all factual findings necessary to support the judgment. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) To avoid application of the doctrine, a party must request a statement of decision, and if one is issued, the party must timely bring any omissions or ambiguities in the statement of decision to the trial court's attention so that the trial court has an opportunity to correct them. (Code Civ. Proc., §§ 632, 634; *In re Marriage of Arceneaux*, *supra*, at pp. 1133-1134; *Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 58-59.) "[I]f a party does not bring such deficiencies to the trial court's attention, that party waives the right to claim on appeal that the statement was deficient in these regards, and hence the appellate court will imply findings to support the judgment." (*In re Marriage of Arceneaux*, *supra*, at pp. 1133-1134.)

Contrary to Appellants' contention on appeal, the record does not demonstrate that the trial court failed to apply California's quantitative approach in determining that they were exempt employees. In its statement of decision, the trial court expressly relied on Labor Code section 515, which establishes statutory exemptions from the state's overtime laws for executive, administrative, and professional employees. It also relied on Wage Order 7, which sets forth the requirements of the exemptions as applied to the mercantile industry in which Appellants were employed. In addition, the trial court explicitly stated that it had applied the method of analysis described in *Ramirez* in determining whether

26

the elements of the claimed executive exemption were satisfied in this case. Indeed, the trial court quoted extensively from *Ramirez* in its statement of decision and explained the legal basis for its ruling as follows: "When, as is the situation in this case, the evidence shows what I will refer to as 'mixed duties,' some exempt from the overtime requirement and some not exempt from the overtime requirement, the proper method of analysis in this court's view is to determine whether the employee worked more than half of his or her working time on exempt duties, that would mean that the employee would be exempt[,] or more than half of the employee's working time on nonexempt duties. That would mean that the employee is not exempt. This is what the *Ramirez* court referred to . . . as a distinctive quantitative approach." The court then found that Appellants were properly classified as exempt employees because they spent more than half of their time performing exempt work.

Appellants' primary objection to the statement of decision is that the trial court did not expressly categorize each task that they performed as either exempt or nonexempt and did not expressly quantify the amount of time that they spent on each of those tasks for each week in the relevant period. In support of their argument that the trial court was required to prepare a "time and task" ledger of their exempt and nonexempt duties, Appellants cite to the following language in *Ramirez*: "On remand, the trial court should . . . itemize the types of activities that it considers to be sales related, and the approximate average times that it finds the employee spent on each of these activities. Because the question whether a particular activity is sales related is a mixed one of law and fact, this itemization will enable an appellate court to review whether the trial court's legal classifications are correct, and whether its factual findings are supported by substantial evidence." (*Ramirez*, *supra*, 20 Cal.4th at p. 803, fn. 5.) Appellants reason that the trial court's failure to itemize each of their tasks as either exempt or nonexempt in the first instance constitutes reversible error because California law does not recognize a hybrid category in which an employee is deemed to be performing an exempt task at the same time he or she is performing a nonexempt task. (*Heyen*, *supra*, 216 Cal.App.4th at p. 826; *Martinez v. Joe's Crab Shack Holdings* (2013) 221 Cal.App.4th 1148, 1154.)

27

Instead, under state law, "the trier of fact must categorize tasks as either 'exempt' or 'nonexempt' based on the purpose for which [the employee] undertook them." (*Heyen*, *supra*, at p. 826.)

In deciding whether Appellants were exempt from California's overtime laws, the trial court was required to determine whether each of the tasks performed by Appellants was either exempt or nonexempt and whether Appellants spent more than one-half of their working time on exempt tasks. (Cal. Code Regs., tit. 8, § 11070, subd. 1(A)(1)(e); *Ramirez*, *supra*, 20 Cal.4th at pp. 797-798; *Heyen*, *supra*, 216 Cal.App.4th at p. 826.) The record on appeal, however, does not support Appellants' claim that the trial court failed to perform the proper legal analysis or to make the necessary factual findings to support its ruling. Although the statement of decision did not include an itemized ledger of Appellants' exempt and nonexempt tasks with approximate time values assigned to each, the trial court did make the ultimate finding of fact that Appellants spent more than one-half of their time on exempt tasks and were thus properly classified as exempt employees. (*Metis Development LLC v. Bohacek* (2011) 200 Cal.App.4th 679, 689 [trial court's statement of decision "'need only fairly disclose its determinations as to the ultimate facts and material issues in the case'"]; *Bauer v. Bauer* (1996) 46 Cal.App.4th 1106, 1118 ["trial court is not required to make an express finding of fact on every factual matter controverted at trial, where the statement of decision sufficiently disposes of all the basic issues in the case"].)

To the extent that Appellants are claiming that the statement of decision was deficient because the trial court did not explicitly identify how it had categorized their various job duties in making its ultimate factual finding, Appellants were required to bring the alleged omission or ambiguity to the attention of the trial court. (Code Civ. Proc., §§ 632, 634; *In re Marriage of Arceneaux*, *supra*, 51 Cal.3d at pp. 1133-1134.) The record reflects that, while Appellants did move for a new trial on the ground that the trial court made certain errors of law, they did not argue in their motion that the court omitted any necessary factual findings in its statement of decision, nor did they ask the court to clarify which tasks it had found to be exempt versus nonexempt in reaching its

28

decision. (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 896 ["[t]o bring an omission or ambiguity to the trial court's attention . . ., a party must identify the defect with sufficient particularity to allow the court to correct the defect"]; *Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 498 ["[t]o bring defects in a statement of decision to the trial court's attention . . ., objections to a statement of decision must be 'specific.'"].) As a result, appellants have forfeited any argument that the trial court's findings were insufficiently detailed.

Appellants also assert that the trial court erred in its application of the law by improperly relying on the argument of defense counsel, the use of the term "manager," and the Assistant Store Director job description. None of these arguments has merit. First, the statement of decision does not reflect that the trial court based any of its factual findings on defense counsel's argument rather than the evidence presented at trial. The trial court merely agreed with defense counsel's summary and characterization of the evidence, noting as follows: "[T]he court finds that those two, Heim and . . . Schreck were fully aware of the distinctions [between management and non-management functions] and were, as [defense counsel] argued today and as appears, quite obviously, from the numerous writings prepared by those people, they were aware of the distinction and they actually drew on those distinctions in giving instructions to their subordinates." Second, while it appears that the trial court (and the parties' attorneys) at times used the terms "managerial" and "exempt" interchangeably, a review of the entire statement of decision demonstrates that the trial court did not simply accept Wild Oats's labels of tasks as "managerial" in performing its exemption analysis. The trial court understood the legal definitions of exempt and nonexempt work and applied those definitions in determining that Appellants spent the majority of their time on exempt tasks. Third, the trial court did not improperly rely on Wild Oats's job description rather than evaluate how Appellants actually spent their time. Consistent with *Ramirez*, the court considered whether the job description reflected the realistic requirements of the position. The court found that the job description had a "firm basis in reality," and that it accurately identified the actual job duties that Appellants performed.

29

Appellants further contend that the trial court erroneously shifted the burden to them to prove they were misclassified as exempt by showing that they were instructed to perform more nonexempt work than exempt work. In support of this claim, they point to the trial court's statement that nonexempt work "was part of what the employees did, but they were not instructed to do that over and above their management functions. And they understood that. This is what the employer instructed, and this is what the employees knew and understood was their job." Appellants reason that their understanding of how they were supposed to spend their time is irrelevant to the question of how they actually spent their time unless their actions diverged from Wild Oats's realistic expectations and Wild Oats expressed dissatisfaction with their work. However, a careful reading of the statement of decision reflects that the trial court's comments about the instructions to Appellants were not intended to shift the burden of proof, but rather to resolve a factual dispute between the parties about the significance of the so-called "80/20" rule. While the plaintiffs asserted that the rule meant they were expected to spend 80 percent of their time performing non-managerial tasks, Wild Oats argued that it merely showed they were expected to spend 80 percent of their time on the sales floor where they performed both managerial and non-managerial tasks. The trial court agreed with Wild Oats, finding that the instruction to the employees to be on the sales floor did not amount to an instruction that they were to perform only nonexempt work. There is nothing in the record to suggest that the trial court shifted the burden of proof.[5]

---

[5] Appellants note that the trial court found that Williamson was subject to the same instructions and expectations as they were, but nevertheless determined that Williamson was a nonexempt employee entitled to overtime compensation. The record reflects that the trial court based its determination that Williamson was a nonexempt employee on its finding that he spent more than half of his time performing nonexempt work. It thus appears that the trial court believed Williamson's testimony about how he spent the majority of his time as an Assistant Store Director, but did not believe the testimony of Appellants about how they spent their time in that same position. While Appellants question the logic of this finding, it was the exclusive province of the trial court to resolve conflicts in the evidence and to determine the credibility of witnesses, and it is

30

**III.    Sufficiency of the Evidence Supporting the Judgment**

Appellants also challenge the sufficiency of the evidence supporting the judgment. They specifically contend that Wild Oats did not meet its burden of proving each element of the claimed executive exemption because there was no substantial evidence that Appellants (1) were involved in the management of the enterprise or a customarily recognized department thereof, (2) customarily and regularly exercised discretion and independent judgment, and (3) primarily were engaged in exempt duties.  (Cal. Code Regs., tit. 8, § 11070, subd. 1(A)(1)(a), (d), (e).)  Considering the totality of the evidence presented at trial, we conclude that the judgment was supported by substantial evidence.

A challenge to the sufficiency of the evidence supporting a judgment is reviewed under the well-established substantial evidence rule.  "'In reviewing the evidence on … appeal all conflicts must be resolved in favor of the [prevailing party], and all legitimate and reasonable inferences indulged in to uphold the [judgment] if possible.  It is an elementary, but often overlooked principle of law, that when a [judgment] is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the [judgment].  When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.'  [Citation.]"  (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571.)  "'[N]either conflicts in the evidence nor '"testimony which is subject to justifiable suspicion . . . justif[ies] the reversal of a judgment, for it is the exclusive province of the [trier of fact] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'"  [Citations.]'"  (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.)  "The substantial evidence standard applies to both express and implied findings of fact made by the superior court in its

---

not the role of this court to second-guess the trial court's credibility determinations. (*Sav-On Drug Stores, Inc. v. Superior Court*, *supra*, 34 Cal.4th at p. 334.)

31

statement of decision rendered after a nonjury trial. [Citation.]" (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462.)

Appellants argue that Wild Oats failed to establish that their job duties and responsibilities involved the management of a customarily recognized department or subdivision of Henry's Markets because there was no evidence that Appellants were in sole charge of any particular department within the store. As set forth in the applicable federal regulations, "[t]he phrase 'a customarily recognized department or subdivision' is intended to distinguish between a mere collection of men assigned from time to time to a specific job or series of jobs and a unit with permanent status and function. In order properly to classify an individual as an executive he must be more than merely a supervisor of two or more employees; nor is it sufficient that he merely participates in the management of the unit. He must be in charge of and have as his primary duty the management of a recognized unit which has a continuing function." (29 C.F.R. § 541.104(a) (2000).) Both Appellants testified that, as Assistant Store Directors, they were responsible for managing the grocery department in their respective stores and for directly supervising the employees in that department, including the Third and Fourth Managers. Appellants' former Store Directors confirmed that each department in the store was managed by a department head, except for the grocery department which was managed by the Assistant Store Director. Indeed, former Store Director Baer stated that "[a]s Assistant Store Director, [Schreck] was also grocery manager so . . . he was in charge of the grocery department . . . and so that was his main task was to be taking care of that department." Baer similarly testified that Heim "was in charge of the grocery department," and that Baer's expectation was that Heim "would handle that department." The testimony of Appellants and their supporting witnesses was sufficient to establish this element of the exemption.

Appellants also assert that Wild Oats failed to demonstrate that they customarily and regularly exercised discretion and independent judgment because the uncontroverted evidence showed that they did not have authority to engage in such activities as setting prices, choosing what products to carry, selecting vendors, or setting labor budgets for the

store.  As defined in the applicable federal regulations, "[t]he phrase 'customarily and regularly' signifies a frequency which must be greater than occasional but which, of course, may be less than constant.  The requirement will be met by the employee who normally and recurrently is called upon to exercise and does exercise discretionary powers in the day-to-day performance of his duties."  (29 C.F.R. § 541.107(b) (2000).)  While the evidence reflected that Appellants' discretionary powers were circumscribed in some respects, it also showed that Appellants had the authority to supervise, train, counsel, discipline, and delegate work to employees, and that they regularly performed such duties in the course of their employment as Assistant Store Directors.  Appellants also admitted that they were in charge of the entire store in the absence of the Store Director, and that at such times, they had ultimate responsibility for supervising each employee in the store and ensuring that store operations were running properly.  As Assistant Store Directors, Appellants typically were scheduled to work on the two days per week that the Store Director was off, and even on the days when both the Store Director and Assistant Store Director were scheduled to work, they usually had different shifts to minimize overlap in their schedules.  Based on such evidence, the trial court reasonably could have found that Appellants customarily and regularly exercised discretion in the day-to-day performance of their job duties.

Appellants' principal contention in challenging the sufficiency of the evidence is that Wild Oats did not meet its burden of proving that they were primarily engaged in exempt work because it failed to present any evidence that showed how much time Appellants spent on exempt tasks.  In support of this claim, Appellants assert that neither of the defense witnesses ever worked with them, and thus, they could not testify about the tasks that Appellants performed or the time that they spent performing them.  Appellants argue that the documentary evidence was also insufficient to satisfy Wild Oats's burden because it did not purport to quantify the amount of time that Appellants spent or were expected to spend on exempt tasks.  Although it is true that Wild Oats did not present direct evidence showing the amount or percentage of time that Appellants performed

33

exempt versus nonexempt work, the totality of the evidence was sufficient to support the trial court's finding that Appellants spent more than half of their time on exempt work.

Both Appellants and their former Store Directors testified about the variety of managerial and supervisory functions that Appellants performed as Assistant Store Directors. Among other tasks, Schreck interviewed prospective employees, participated in hiring decisions, assisted in preparing performance appraisals, and provided training, direction, counseling, and discipline to the employees he supervised. Schreck also was responsible for managing inventory to avoid out-of-stock and overstocked items, and for ensuring the accuracy of all invoices and expenses for the grocery department. Heim similarly trained, supervised, counseled, and delegated work to employees, prepared and delivered performance appraisals, and provided input on employee personnel decisions. Heim also was responsible for managing loss prevention and shrinkage issues for the grocery department, preparing sales and margin reports for the grocery department, inspecting product shipments for quality assurance purposes, managing inventory, preparing store schedules, participating in manger meetings, and ensuring regulatory compliance for the store. Both Schreck and Heim testified that they were directed to spend at least 80 percent of their time on the sales floor, but admitted that such time was not limited to performing nonexempt tasks such as stocking, cashiering, or bagging groceries. Instead, their work on the sales floor also included time spent supervising, training, and directing the work of subordinate employees. In addition, Appellants admitted that they assumed the duties of the Store Director whenever he was absent from the store, which typically occurred two days per week and for part of Appellants' shifts on the other three days they were scheduled to work.

Wild Oats also presented a significant number of employee personnel documents that were prepared by Appellants in their capacity as Assistant Store Directors, including performance appraisals and disciplinary warnings for subordinate employees. Appellants argue that this documentary evidence was insufficient to support the finding that they spent the majority of their time on exempt work given their uncontroverted testimony that it took a minimal amount of time to prepare and deliver such documents to

34

employees.  However, as Wild Oats correctly asserts, the probative value of the evidence was not limited to showing the amount of time that was spent in the preparation of the documents themselves, but also extended to demonstrating the amount of time that Appellants would have needed to spend monitoring and managing the employees in order to properly evaluate their performance.  The contents of the documents were also probative on the issue of Appellants' credibility because, as the trial court observed, they supported the inference that Appellants would not have instructed their subordinate managers to perform more supervisory functions unless Appellants were performing such functions themselves.

Appellants contend that the evidence showing that they performed managerial or supervisory tasks was insufficient to satisfy Wild Oats's burden of proof because none of the evidence demonstrated the amount or percentage of time that they actually spent on such tasks.  Appellants also claim that the trial court's mere disbelief of their testimony concerning how much time they spent on exempt tasks was not, in and of itself, sufficient to support the finding that Appellants were properly classified as exempt.  Although it is true that Wild Oats did not present any direct evidence establishing the amount of time that Appellants spent on exempt versus nonexempt tasks, it did present substantial evidence showing the myriad of managerial and supervisory functions that Appellants performed on a day-to-day basis.  It is well-established that "'[s]ubstantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom.'" (*Roy v. Superior Court* (2011) 198 Cal.App.4th 1337, 1349.)  "'[T]he fact that evidence is "circumstantial" does not mean that it cannot be "substantial."'  [Citation.]"  (*County of Kern v. Jadwin* (2011) 197 Cal.App.4th 65, 73.)  Moreover, "'[w]here statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.'  [Citation.]"  (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1531.)  Based on the extensive testimonial and documentary evidence that was presented at trial about Appellants' day-to-day duties and responsibilities, the trial court was free to draw reasonable inferences as to how

Appellants spent a majority of their time, and from such inferences, reasonably could find that Appellants spent more than one-half of their time performing exempt work.  The trial court's judgment was therefore supported by substantial evidence.

**DISPOSITION**

The judgment is affirmed.  Wild Oats shall recover its costs on appeal.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.